IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | | |
|---|---|---|
| VICKI LYNN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| | ) | |
| vs. | ) | CLASS ACTION COMPLAINT |
| | ) | |
| Daniel J. Beers, Ronald | ) | (JURY TRIAL DEMANDED) |
| Beers, Daniel Beers, Jr.,| ) | |
| Druzilla J. Abel, Thomas | ) | |
| Fabris, Brandon Fabris, | ) | |
| Douglas D. Behrens, | ) | |
| Dale E. Bellis, Larry | ) | |
| Foster, Dorsey Morrow, | ) | |
| Don Brewer, Durlin | ) | |
| Beachy, Everett Yoder, | ) | |
| Robert Klinestiver, | ) | |
| Phyllis Ingram, Stephen | ) | |
| Doukas,Joseph Gingerich, | ) | |
| Ryan Mast, Scot Burris, | ) | |
| Brian Basik, | ) | |
| Individual Defendants, | ) | |
| and Gospel Light | ) | |
| Mennonite Church Medical | ) | |
| Aid Plan, National | ) | |
| Coalition of Health Care | ) | |
| Sharing Ministries, The | ) | |
| MedicalCost Savings | ) | |
| Solution, LTD, Cost | ) | |
| Sharing Solutions, LLC, | ) | |
| and Savnet International,| ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the plaintiff, VICKI LYNN, who hereby files this Class Action Complaint against the above-named Defendants, and who would respectfully show unto the Court as follow:

1

## **PARTIES**

1.     Plaintiff, VICKI LYNN, is a South Carolina resident residing in Gaffney, South Carolina 29340.  Plaintiff became a member of Liberty HealthShare on or about October, 2017.  She left Liberty HealthShare in 2022.

2. Defendant Gospel Light Mennonite Church Medical Aid Plan Incorporated ("Gospel Light"), a Virginia non-profit corporation with its principal place of business in Ohio.  Gospel Light does business as Liberty Healthshare.

3. Defendant National Coalition of Health Care Sharing Ministries ("National Coalition") was an Ohio non-profit corporation with its principal place of business in Ohio.  It derived all or substantially all of its revenue from Gospel Light for provisioning administrative services to Gospel Light.

4. Gospel Light and National Coalition worked in such concert that they are referred to in this complaint jointly as Liberty.

5. Defendant The Medical Cost Saving Solution, LTD. d/b/a Med Cost Solution, LLC ("MCS") is an Ohio for profit limited liability company that is affiliated with Liberty founded on or about June 29, 2015. MCS is owned by Thomas Fabris.  MCS holds itself out as leading the health sharing industry in providing service for claim repricing, balance bill advocacy, and self pay patient legal support.

2

6. Defendant Cost Sharing Solution, LLC ("CSS") is an Ohio for profit limited liability company founded by Defendant Daniel J. Beers, JR and Brandon Fabris. CSS manages clients sales campaigns by serving as a call center sales and support hub. CSS also provides other marketing services, such as radio broadcasting search engine marketing, etc. to Liberty.

7. Defendant Savnet International LLC ("SAVNET") is an Ohio based for profit limited liability Company founded by Douglas Behrens, one of Liberty's founders. Savnet holds itself out as a pharmacy and prescription discount program and was one of Liberty's service providers.

8. Defendant Daniel J Beers is, upon information belief, an individual residing in the state of Ohio, County of Stark. He is Defendants Daniel J. Beers, JR and Ron Beers's father and Drudy Abel's brother. Defendant Daniel J. Beers exerted  de facto control over Liberty's day to day and financial transactions, as well as activities of the Related Defendants.  He was also employed by Liberty at various times in the past.

9. Defendant Ronald Beers is, upon information belief, an individual residing in the State of Ohio, County of Summit. He is Defendant Daniel J. Beers son, brother to Defendant Daniel Beers Jr, and Drudy Abel's Nephew. He currently shares ownership in CSS with Defendant Brandon Fabris and Defendant Daniel Beers, II.

10.  Defendant Daniel Beers II is, upon information and

3

belief, an individual residing in the State of Ohio, County of Stark. He is Defendant Daniel J. Beers son, brother to Defendant Ronald Beers, and Drudy Abel's nephew. Defendant Daniel Beers JR also co-owns Defendants CSS, an affiliated company to Liberty.

11.   Defendant Druzilla ("Drudy") Abel is, upon information and belief, an individual residing in the State of Ohio, County of Stark. She is also Defendant Daniel J. Beers's sister and aunt to Defendants Ronald Beers, Daniel Beers, JR. Defendant Drudy Abel is a founder of Liberty and was an officer and/or Director of Liberty at relevant times in the past.

12.   Defendant Thomas Fabris is, upon information and belief, an individual residing in the State of Ohio, County of Stark. He is also Defendant Brandon Fabris's father. Defendant Thomas Fabris owns Defendant MCS, a single member LLC that is an affiliated company to Liberty. Defendant Thomas Fabris is, at times, referred to as "MCS's controlling individual."

13.   Defendant Brandon Fabris is, upon information and belief, an individual residing in the State of Ohio, County of Stark. He is also Defendant Thomas Fabris's son. Defendant Brandon Fabris co-owns Defendant CSS, an affiliated company to Liberty.

14.   Defendant Douglas Behrens is, upon information and belief, an individual residing in the State of Ohio, County of Summit. He is a former Director of Liberty and Defendant Dale

4

Bellis's former business partner. Defendant Douglas Behrens also owns Defendants Savnet, an affiliated company to Liberty. Defendant Douglas Behrens is, at times, referred to as "SavNet's controlling individual."

15.  Defendant Dale E. Bellis is, upon information and belief, an individual residing in the State of Ohio, County of Stark. He was Liberty's CEO until discharged. Upon information and belief, Defendant Dale Bellis has also been Defendant Daniel J. Beers JR life long friend.

16.  Defendant Larry Foster is, upon information and belief, an individual residing in the State of Ohio, County of Stark. He is a former director of Liberty and a former CEO of Liberty.  As CEO, he approved or continued many of the Related Entity transactions discussed below.

17.  Dorsey Morrow is, upon information and belief, an individual residing in the State of Ohio, County of Portage. He is the current Chief Executive Officer of Liberty.

18.  Defendant Don Brewer is, upon information and belief, an individual residing in the State of Indiana, county of Hancock. He is the current chairman of the Board of Liberty.

19.  Defendant Durlin Beachy is, upon information and belief, an individual residing in the State of Virginia, County ofAlbemarle. He is a current Board Member of Liberty.

20.  Defendant Everett Yoder is, upon information and

5

belief, an individual residing in the State of Tennessee, county of Henry. He a current Board Member of Liberty.

21. Defendant Robert Klinestiver is, upon information and belief, an individual residing in the State Indiana, County of Hancock. He is a current Board member of Liberty.

22. Defendant Phyllis Ingram is, upon information and belief, an individual residing in Alabama, County of Montgomery. She is or was a Board member of Liberty.

23. Defendant Stephen Doukas is, upon information and belief, an individual residing in the State of Florida, County of Pinellas. He is or was a board member of Liberty.

24. Defendant Joseph Gingerich is, upon information and belief, an individual residing in the state of Virginia, County of Greene. He is a former Director of Liberty.

25. Defendant Ryan Mast is, upon information and belief, an individual residing in the State of Virginia, County of Albemarle. He is a former director of Liberty.

26. Defendant Scot Burris is, upon information and belief, an individual residing in the State of Indiana, County of Marion. He is a former director and Chairman of the Board of Liberty.

27. Defendant Brian Basik is, upon information and belief, an individual residing in the State of Florida, County of Lee. He is a former Member of the Board for Liberty.

28. Defendants Stephen Doukas, Phyllis Ingram, Robert

6

Klinestiver, Everett Yoder, Don Brewer, Durlin Beachy, Joseph Gingerich, Ryan Mast, Scot Burris, and Brian Basik are or were all directors of Liberty and are, at times, referred to as "Director Defendants."

29.  Defendants Dorsey Morrow, Drudy Abel, Dale E. Bellis, and Larry Foster are at times referred to as "Executive Defendants."

30.  Defendants Ronald Beers, Donald Beers II, and Brandon Fabris are, at times, referred to as "CSS's controlling individuals."

**JURISDICTION AND VENUE**

31.  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and the Defendants are citizens of different States and the amount in controversy exceeds the sum of value of 75,000.00 dollars, exclusive of interest and cost.

32.  This court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1331, The Class Action Fairness Act, 28 U.S.C. § 1332(d), and 28 U.S.C. § 1367. Upon information belief, the matter in controversy exceeds $5,000,000, exclusive of interest and costs and this matter is a class action in which certain Class Members are citizens of states other than certain Defendant's States of residence.

33.  This Court has jurisdiction over all Defendants because each Defendant is an entity that conducts business and maintains

7

operations in this district, or were involved in a civil conspiracy that had substantial effects in this jurisdiction. They advertised, wrote, and sold and continue to advertise, write and sell, illegal insurance products in the State of South Carolina.

34.  All Defendants conspired to have those illegal insurance products have a substantial effect in the State of South Carolina.

35.  All Defendants have sufficient minimum contacts with South Carolina as to render the exercise of jurisdiction by the South Carolina Courts permissible under traditional notions of fair play and substantial justice and S.C. Code Ann. § 36-2-803(A)(1), (A)(3), (A)(6), (A)(7), § 38-25-510(a), and §38-61-10.

36.  Venue in this Court is proper pursuant to 18 U.S.C. § 1965(a) an 28 U.S.C. § 1391. A substantial portion of the transactions and wrongs complained of herein occurred in this district.

37.  Jurisdiction and venue are proper as the sale of the insurance policy at issue giving rise to this cause of action occurred in this jurisdiction, as did the advertising that led to the sale.

## CLASS ALLEGATIONS

38.  The preceding paragraphs are incorporated by reference as though fully set fourth herein.

8

39.  Plaintiff asserts the allegations raised herein on behalf of herself and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, as representative of a class of persons similarly situated. The class is defined as follows:

> All current, former, and future participants in Liberty plans in South Carolina who have made or will make periodic payments to Liberty to participate in plans presented as healthcare sharing ministries. Excluded from the class or officers, directors, and employees of the Defendants. Also excluded are the individual Defendants. The class period is the maximum length of time not time-barred beginning no earlier than 2013.

40. While the exact number of class members is presently unknown to the Plaintiff, class membership is ascertainable based upon the records maintained by the Defendants. Upon information and belief. Plaintiff contends that the class includes hundreds if not thousands of members. As such the class is so numerous that joiner of all members in a single proceeding is impracticable.

41. The claims of the named Plaintiff is typical of the claims of the class members generally. Plaintiff and other class members have been deprived of the benefit of the bargain into which they entered with the Defendants. They have also been the victims of a civil conspiracy by said Defendants. That civil conspiracy is currently ongoing. The Plaintiff and class members have been denied benefits due them, and/or they have received

9

less then they were promised, and have all purchased illegal
insurance contracts under the laws of the State of South
Carolina.

42.  There exist questions of law and fact common to all
members. Without limitation, these common questions include:

a. Whether Liberty's plans were healthcare sharing
ministry plans under the Affordable Care Act, 26 U.S.C.A. §
5000A(d)(2)(B)(ii);

b.  Whether Liberty's plans were illegal insurance
plans under South Carolina Law Title 38, Chapter 71;

C.  Whether Liberty's plans were falsely represented to
not be insurance under the Laws of the State of South Carolina
and the Affordable Care act;

d.  Whether Defendants violated Federal or State Laws
by offering and selling their plans to Plaintiffs in the class or
by administering those plans;

e.  Whether Defendants knew or should have known that
the plans they sold to Plaintiff and the class members were not
healthcare sharing ministry plans under the Affordable Care Act;

f.  whether Defendants knew that the plans that they
sold to Plaintiff and the class members constituted insurance
under South Carolina Law;

g.  Whether Plaintiff and class members have been
damaged, and if so, are eligible for and entitled to compensatory

10

and punitive damages;

h.   Whether Liberty's uniform policy of conditioning membership on making at least the "suggested monthly share amount" qualifies as voluntary contribution as well as valid consideration for its standard membership contract;

i.   The nature, scope, and operations of Defendants wrongful polices;

j. Whether Defendants were agents, each of the other, operating, acting, and otherwise conducting and comporting themselves, with express or implied consent, for the benefit and in the name of one another, within the terms and limits and to the extent, whether expressed or implied, of the agency relationship that existed between them, for the purposes of undertaking and accomplishing the actions complained of herein;

k. Whether Plaintiffs in the class were third party beneficiaries of contracts between Defendant entities facilitating Defendant's fraudulent scheme;

l.   Whether Defendants had a policy in practice of fraudulently charging persons supra-market rates;

m. Whether MCS, CSS, and SavNet are Liberty's alter egos;

n. Whether Defendants' conduct inflated the amounts that Plaintiffs and the class members paid for medical cost "sharing" by more than they would owe if Defendants acted

lawfully;

o.  Whether Defendants engaged in self dealing;

p.  Whether Defendants engaged in prohibited transactions;

q.  Whether Defendants breached contractual obligations to Plaintiffs and class members;

r.  Whether Defendants were unjustly enriched;

s.  Whether and to what extent Liberty's board members, current and former, as well as executives, current or former, are personally liable for insurance contracts sold to Liberty's members, Plaintiff, and the putative class members;

t.  Whether the refusal by Liberty to pay benefits due under these contracts resulted from the insurer's bad faith or unreasonable actions in breach of an implied covenant of good faith and fair dealing arising in those contracts;

u.  The nature and extent of damages and other remedies owed to Class Members by virtue of Defendant's conduct; and

v.  Whether this Honorable Court can enter declaratory injunctive, or other equitable relief.

43.  Plaintiff will protect fairly and adequately the interest of the class she seeks to represent. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the proposed Class. Plaintiff's counsel is experienced and competent in the prosecution of complex class litigation.

44. Certification pursuant to Fed.R.Civ.P. 23(b)(2) is proper for the class defined above because the maintenance of separate actions by individual members of the class would create a risk of varying adjudications with respect to interpretations of uniform policy terms and obligations that would establish incompatible standards of conduct for the Defendants as the parties opposing class. Furthermore, certification under Fed.R.Civ.p.23(b)(2) is proper because adjudications with respect to individual class members would, as a practical matter, be dispositive of the interest of other class members not a party to the adjudications or would substantially impair or impede their abilities to protect their interest. In addition, the Defendants, as the parties opposing the class, have acted or refused to act on grounds generally applicable to the class thereby making relief appropriate with respect to the class as a whole.

45. While Plaintiffs specifically state that certification to Fed.R.Civ. 23(b)(2) is proper by itself for this entire action because monetary damages in the form of restitution is merely incidental to the declaratory and injunctive relief sought, Plaintiffs alternatively allege that certification of the class defined above is likewise proper under Fed.R.Civ.P. 23(b)(3). Specifically, common issues of fact and law as set forth above predominate over any individual issues that may exist. Furthermore, a class action is superior to other available

13

methods for a fair and efficient adjudication of this action as a
class. The interest of judicial economy favor adjudication of the
claims alleged herein on a class basis and adjudication of this
action as a class is properly manageable. The interest of
judicial economy favor adjudication of the claims alleged hereon
on a class basis rather than an individual basis, especially
where, as here, the amount of damages for each claim are small
compared to the burden and expense that would be incurred if each
claim was litigated individually.

46.  The Defendants have acted on grounds generally
applicable to the class by selling insurance policies to members
in South Carolina without being subject to the regulation imposed
by State Law and Federal Law, they have administered monthly
premium payments, deductible amounts, and  paid out claims based
on sharing guide lines that are frankly analogous to an insurance
contract. They have engaged in a civil conspiracy to sell illegal
insurance contracts to their members. They have diverted funds in
excess of those allowable by law for insurance companies. They
have refused to pay claims properly presented to them. They have
done these thing in breach of their fiduciary duties, in bad
faith, and in breach of their contracts. For this reason
Plaintiff, on behalf of herself and all other similar situated,
asks that Defendants be enjoined from continuing their dishonesty
in bad claims practices and that Defendants be ordered to pay the

14

benefits promised in the policy.

## **FACTUAL ALLEGATIONS**

47.  The paragraphs 1-38 are incorporated by references though fully set forth by herein.

### *Liberty HealthShare's Corporate History*

48.  On November 14, 2000, The Mindala Family Foundation filed its Articles of Incorporation in Ohio.

49.  Gospel Light Mennonite Church Medical Aid Plan Incorporated was incorporated by Durlin Beachy and Joseph Gingerich on June 3, 2014 in the Commonwealth of Virginia.

50.  Light Your World Ministries Inc. was incorporated in Indiana on or about March 2, 2005. Larry Foster of Lebanon Indiana is listed as the director in all subsequent filings.

51.  Liberty Healthshare Council, Inc. was incorporated by Defendant Dale E. Bellis, Defendant Douglas Behrens, and Defendant Druzilla J. Abel in the State of Ohio on June 15, 2012.

52.  On July 29, 2013, the Mindala Family Foundation acquired the tangible and intangible assets of Liberty Healthshare Council, Inc. and Christian Financial Death Assistance, a dba of Light Your World Ministries.

53.  As a result of that transaction, Liberty Healthshare Council, Inc. dissolved and the Mindala Family Foundation changed its name to Liberty Health Share, Inc.

54.  At sometime between July 29, 2013, and November 25th

2013, Defendant Dale Bellis became the executive director of the combined entity Liberty Health Share Inc.

55. Liberty Health Share applied to become a Health Care Sharing Ministry on November 21, 2013 and on March 17, 2014.  It withdrew its application on February 11, 2015.

56.  At some point between June 9, 2014, and December 3rd 2014, Defendant Dale Bellis became the chairman of Gospel Light Mennonite Church Medical Aid Plan.

57.  On December 5, 2014, Gospel Light received a license as a foreign nonprofit corporation in Ohio.

58.  Gospel Light applied to become a Health Care Sharing Ministry on January 29, 2014. It was approved on or about March 31, 2014.

59.  On June 15, 2015, Gospel Light applied to use the trade name "Liberty Health Share." Defendant Dale Bellis signed the application for the trade name and the document allowing Gospel Light to use that trade name on behalf of Liberty Health Share Inc. Defendant Druzilla Abel also signed that document on behalf of Liberty Health Share Inc.

60.  On July 13, 2015, Liberty Health Share, Inc changed its name to the National Coalition of Healthcare Sharing Ministry Inc. (National Coalition). Defendant Dale Bellis continued as the Chairman for both Gospel Light and National Coalition.

61.  National Coalition's new business purpose was to

16

provide Health Care Sharing Ministries with administrative
support.

62.  On September 9, 2014, Calvary Health Care Sharing
Ministry was incorporated with Everett Yoder as its director in
Virginia with a principal place of business in Tennessee. It
never filed as a foreign corporation doing business in Tennessee.
It is still in existence today.

63.  Calvary Christian Fellowship, dba Calvary Health Care
Sharing Ministry, applied to become an HCSM on May 2, 2014.  It
was approved on June 11, 2014.

64.  None of these corporations have filed as nonprofit
charities, corporations, solicitors, or insurers in the State of
South Carolina.

65.  According to Liberty's website, Calvary Health Care
Sharing Ministry, Gospel Light Mennonite Church Medical Aid Plan,
Inc, and Christian Financial Death Assistance "unified" in 2014.

66.  At various times, Liberty has claimed to be a
"reorganization of an existing group that has been sharing cost
since 1988," or that "Liberty Health Share is a healthcare
sharing ministry of an existing group (Gospel Light Mennonite
Church Medical Aid Plan, Inc.)that has been sharing cost since
1995."

67.  In 1982, an Ohio nonprofit corporation called Barberton
Rescue Mission begin a news letter called the Christian

17

Brotherhood News Letter, with the goal of matching member's healthcare needs to other members willing to pay some portion of those needs.

68. Defendant Daniel J. Beers and Jeffery A. Beers incorporated a for-profit corporation called Benevolent Health Systems, Inc. (BHS) on March 31, 1995.

69. BHS operated a service for the Christian Brotherhood News Letter whereby it would contact medical service providers on behalf of the members of the newsletter and request that those providers discount member bills based on the Christianity of the member. BHS had a contract that paid it fifteen percent of the amount each providers bill is reduced.

70. At the time of the contract's signing as well as during the time of its execution, Defendant Daniel Beers was employed by the Barberton Rescue Mission, making that contract one between affiliated entities. Both Defendant Daniel J. Beers and Jeffery A. Beers were related to a trustee of the Barberton Rescue Mission, Ronald Beers.

71. On or about December 11, 2000, the Attorney General of Ohio and two trustees of the board of directors of the Barberton Rescue Mission sued Defendant Daniel J. Beers, Jeffery Beers, Benevolent Health Systems Inc and others alleging a number of causes of action, including breaches of fiduciary duty.

72. A trial was held in Summit County Ohio on May 4,2004,

18

ended with verdicts on May 25, 2004, and final judgement was entered by Judge Cosgrove on March 29, 2005. Verdict was entered against Defendant Daniel J. Beers as to breaches of fiduciary duty to Barberton Rescue Mission and conversion. Verdict was entered against the for profit corporation Benevolent Health Systems, Inc. on breaches of fiduciary duty, conversion, civil fraud, and unjust enrichment.

73.  Liberty's website often touts the experience of its founders without pointing to the truth behind that experience.

74.  Neither Liberty nor any of its predecessors have been in existence since 1999, nor have its members been sharing healthcare costs among themselves since 1999.

75.  Upon information and belief, Defendant Daniel J. Beers has exercised dominion and control over Liberty and its related entities through his familial and friendship connections.  He has further received payments from Liberty and its Related Entities.

*Liberty's Insurance Plans*

76.  When signing up for a Liberty plan, a member must submit an application and provide a medical history, as with the typical insurance underwriting process. If a member does not submit a complete or accurate medical history, she can be denied, or can be "retroactively denied" membership.

77.  Upon approval, the first two months premiums go to the corporation. An additional twelve percent of each premium is paid

19

to administrative fees.

78.  As with traditional medical insurance, there are three tiers of coverage available to Liberty members, the names of which have changed throughout the years.

79.  Each tier has a different premium amount and deductible, called a "suggested monthly sharing amount" and an "annual unshared amount."

80.  The "suggested monthly share amount" is determined by the provider based on the program level of the member. It further requires membership dues be paid at the time of application and the first day of each members annual renewal month.

81.  The sharing guidelines in the section entitled " submit dues and suggested monthly shares," state that:

> Each month a sharing member is assigned a specific need in which to share. By submission of the Suggested Monthly Share Amount, the member instructs Liberty Health Share to assign his/her contribution as prescribed in these Guidelines, which set forth the conditions upon which Sharing member medical expenses will be shared. By participation in the Program, the Sharing Member both accepts those conditions as enforceable and binding within the in program for the assigning of his/her contribution and designates Liberty Health Share as the final authority for the interpretation of these guidelines.

82.  The premium is not "voluntary" except in the sense all payments in exchange for services are voluntary. If the member fails in these monthly and annual payments, he or she is

20

immediately suspended, retroactively as of the first day of the
month.

83.  As such, coverage is conditioned on timely payment and
providing a truthful accounting of one's medical history. In
exchange for accurately filling out the application and payment
of monthly fees, a Liberty member remains eligible to have her
expenses paid by Liberty upon certain determinable contingencies
set out in the sharing guidelines.

84.  In addition, Liberty assigns the contribution according
to its own discretion, rather than being a passive entity that
simply matches members willing to shoulder some of another
member's burden to those burdened members.

85.  The sub accounts are referred to by Defendants as a
"share box." Liberty claims not to own, operate, or otherwise
control those accounts.

86.  Plaintiffs and class members are not allowed to
withdraw money from the share box, nor are they allowed to direct
the payment of the funds in that "share box" to various other
members.  They exercise no dominion or control over the proceeds
in the "share box."

87.  By contrast, Liberty writes checks on those accounts
and otherwise disposes of the money in the accounts, allegedly
for the benefit of its members.  Money in these accounts has been
spent on nonadministrative costs of the Related Entities.

21

88.   These accounts are not reported on the company's Form 990 as custodial or escrow accounts.  They are treated within the audited financial statements of the company, but are dealt with summarily and as a single account, rather than on an account by account basis.

89.   Liberty determines, in its sole discretion, to what "needs" the premium is applied.

90.   Liberty further allows that, where insufficient premiums are available to satisfy the eligible costs over a sixty day period, premiums may be increased to satisfy those "needs," in its own discretion.

91.   Liberty further administers a deductible, termed an "annual unshared amount," in each plan.  It further disallows any medical expenses other than accidents, acute injury, or illness for the first two months of membership.

92.   The sharing guidelines detail the coverage available for preventative care, primary care, chronic maintenance, labs and diagnostic, tele-medicine, prescription drug programs, urgent care, specialty care, hospitalization, surgery, emergency room visits, and more.

93.   Liberty also administers a network of physicians it calls "suggested providers" through a directory on its website.  These providers are designated in the directory with a green check mark and the indication of "Suggested Provider."  These

22

suggested providers are ones "who charge fair and reasonable industry rates."

94.  All of these features are features of a traditional insurance plan, not the Health Care Sharing Ministries upon which the exemption for the Affordable Care Act was based.

95.  Liberty's members do not play a roll in determining benefit guidelines, determining procedure for allocating benefits, determining which medical expenses will be covered, or determining who gets paid benefits and when. Instead, Liberty alone, through the Executive Defendants and the Director Defendants, develops membership guidelines, determines which medical expenses is covered, and retains total discretion to determine which claims will be paid, without member input. While Liberty holds itself out as an organization that facilitates the sharing of healthcare cost in reality Liberty, like a traditional insurer, is the sole and final arbiter of the plans and benefits claims, and its members play no material role in managing the plans.

**Related Entities**

96. Despite Liberty's designation as a nonprofit corporation, it conducts and conducted business through related entities and affiliated for-profit enterprises in a scheme to funnel profits to the Affiliated Defendants.

97. The Affiliated Defendants are illegal constructs of

23

board members, former board members, and/or family members whose relationships were not properly disclosed in order to charge over-market prices for services, thereby significantly eroding the portion of member contributions available for "sharing."

98. Defendant Cost Sharing Solution, LLC ("CSS") is an Ohio for profit limited liability company founded by Defendant Daniel J. Beers, JR and Brandon Fabris. CSS is a contractual service provider to Liberty that holds itself out as conducting "[m]arketing, call center operations, and technology consulting on behalf of HealthCare [sic] Sharing Ministries," and as such is an affiliated company to Liberty and necessarily intertwined with its operations. CSS also provides other marketing services, such as radio broadcasting, search engine marketing, etc. to Liberty.

99. Defendant Daniel Beers, Jr. owns a majority interest in CSS and is a non-voting member.

100. Defendant Ronnie Beers is an employee of CSS.

101. According to Liberty's 2017 Form 990, CSS was Liberty's highest paid independent contractor with compensation totaling $17,859,288, nearly seven times the amount of the next highest paid independent contractor for professional services.

102. By 2020, CSS's compensation rose to $20,712,716, twenty-nine times more than any other service provider and nearly 40% of Liberty's membership dues and fees. CSS and Liberty also shared the $250,000 cost to be lead sponsors of CPAC 2020,

the Conservative Political Action Conference.

103.   Upon information and belief, CSS acts as "a producer of insurance" as that term is defined by SC Code Ann. § 38-43-10.

104.   Upon information and belief, CSS has not complied with any of the requirements of Chapter 43 of Title 38 of the South Carolina Code of Laws.

105. Defendant, The Medical Cost Saving Solution, LTD. d/b/a Med Cost Solution, LLC ("MCS") operates a claims repricing business in which it endeavors to reduce the bills Liberty is required to pay.  This is in substance acting as a third party administrator as defined by SC Code Ann. § 38-51-10.

106.   Upon information and belief, MCS is not presently, nor has it ever been, registered within the state of South Carolina as a foreign corporation doing business here.

107.   Upon information and belief, MCS is not licensed under SC Code Ann. §38-51-20, has not posted the surety bond required by SC Code Ann. §38-51-30, nor has it ever attempted to have its agents licensed as insurance adjustors under Title 38, chapter 47 of the South Carolina Code of Laws.

108.   Upon information and belief, MCS does not and has not complied with the requirements of South Carolina's statutes and regulations with respect to administrators of insurance benefits plans nor has it required its agents to comply with the statutes and regulations regarding adjustors.

25

109.  Prior to MCS's involvement with Liberty, bill repricing services were provided by Legacy Management Group.

110.  In 2014, Legacy Management Group received a total of $204,432 according to National Coalition's Form 990.  National Coalition is an affiliated entity of Liberty.

111.  In 2015, Legacy Management Group received $701,338.

112.  Legacy Management Group was led by Dale E. Bellis, Jim Mindala, and Douglas D. Behrens.  Dale E. Bellis in 2014 was the Chief Executive Officer of Liberty.  He was in that position for as long as Legacy Management Group was involved with Liberty. Jim Mindala and Douglas D. Behrens were both former directors of Liberty.

113.  While National Coalition's Form 990 does declare the conflict of interest and say that Bellis is divesting himself of his interest in Legacy Management Group, it does not list that conflict for 2014.  It does not list a conflict at all with Mindala or Behrens.

114.  Defendant Bellis did divest himself of the company, but to Thomas Fabris, the father of Brandon Fabris, co-owner of CSS with Defendant Daniel Beers, Jr. Defendant Thomas Fabris then dissolved Legacy Management Group on or about September 9, 2015.

115.  Thomas Fabris, as the owner of Medical Cost Saving Solution, Ltd., received $763,608 in 2015 for claims repricing services.

26

116.  Defendant Savnet International LLC ("SAVNET") was founded by Douglas Behrens, one of Liberty's founders, and holds itself out as a pharmacy and prescription discount program and was one of Liberty's service providers.

117.  Defendant Douglas Behrens founded SavNet on or about March 24, 2016.

118.  Liberty requested proposals from vendors on or about May, 2016, just 2 months after the foundation of SavNet.

119. SavNet provided an overview of a prescription discount program to Liberty prior to July 1, 2016, just 3 months after its incorporation.

120.  On July 1, 2016, SavNet entered into a "discount aggregate program marketing agreement" with Alliance HealthCard, Inc. on July 1, 2016.

121.  A "health savings discount program affinity agreement" was then entered into on September 1, 2016 between MCS and SavNet to enroll Liberty HealthShare participants in SavNet's program. 5 months and 8 days after one of the founders of Liberty founded SavNet.

122.  This process was a mere sham orchestrated by the Individual Defendants to allow Defendant Behrens to profit from the success of Liberty.  In fact, SavNet's website is http://savnet4liberty.com.

123.  Should a member wish to cancel her enrollment in

SavNet, then she would need to "in writing, notify SavNet at P.O. Box 5157 Fairlawn, OH 44334 or by calling 1-855-58-LIBERTY (1-855-585-4237)." This phone number is actually a phone number to contact Liberty.

124.  These related entities further received money, from the shareboxes of members for "non administrative expenses." It is frankly unclear how those payments were accounted for with IRS or if they were so accounted.  These related entities were not medical service providers and so should not have received moneys from accounts designated for member medical needs.

125. Liberty contracted with a related entity, The National Coalition of Health Care Sharing Ministries, Inc. to provide selective supportive services. Those costs totaled $58,723,816 for the 2018 calendar year. The two organizations are related because their boards of directors have common members and a common corporate history. The National Coalition of Health Care Sharing Ministries, Inc. reported on its 2018 audited financial statements that about 26% of their expenses were used for management and general purposes and about 74% of their expenses were used for direct program purposes.

126.  All or substantially all of Liberty's dues revenue was paid to the National Coalition of Health Care Sharing Ministries, Inc. and all or substantially all of the National Coalition's was derived from Liberty.

28

127.  Upon Information and belief, Defendant Daniel Beers exercised de facto control of both entities.

128.  As part of a settlement with the Ohio Attorney General's Charitable Law section, National Coalition of Healh Care Sharing Ministries, Inc. dissolved itself.

129.  As part of a settlement with the Ohio Attorney General's Charitable Law Section, Gospel Light as Liberty was required to allow all contracts with SavNet, MCS, and CSS to either lapse or not be extended beyond March 21, 2022.

130. Despite these related party transactions, Liberty's website claims "[o]ur Board of Directors is the final authority that oversees the entire organization. Our Board Members are independent, non-compensated decision makers who follow a strict conflict of interest policy."

131.  The Director Defendants are integral in selling these insurance products to the public because they are offered as impartial governors of a benevolent heath care entity.

132.  Upon information and belief, Defendant Daniel J. Beers has exercised control of these Related Entities and has received payments from them.

133.  These entities, and their controlling individuals, knew or should have known that they were operating within South Carolina without complying with South Carolina Law.

134.  These entities, and their controlling individuals,

29

knew or should have known that Liberty was operating an insurance business and that they were aiding and abetting that insurance business.

135.  These entities and their controlling individuals knew or should have known that the representations that they made on behalf of Liberty were false or misleading and that the Plaintiff and the Class would rely to their detriment on those false and misleading statements.

136. With respect to Liberty's Form 990 for 2019, Defendant Drudy Abel, Liberty's CEO at the time, disclosed the following family relationships on Schedule L:

> Cheryl Foster (Spouse), Administrative Services, Matthew Bellis (Son), Administrative Services, Pamela Johnson (Sister), Administrative Services, Druzilla B Heim (Daughter), Administrative Services, and Emily Braucher-Abel (In-Law), Administrative Services.

137. Contrary to the foregoing disclosures, Defendant Drudy Abel answered "No" to the following questions in Part IV (Checklist of Required Schedules) of Liberty's Form 990 for 2019:

> 25b. Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ?
> 28. Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions):
>> a. A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor?
>> b. A family member of any individual described in

> line 28a?
> c. A 35% controlled entity of one or more
> individuals and/or organizations described in
> lines 28a or 28b?
> 34. Was the organization related to any tax-exempt or
> taxable entity?
> 35a. Did the organization have a controlled entity
> within the meaning of section 512(b)(13)?

138. Also, in contrast to the foregoing disclosures in Liberty's Form 990 for 2019, Defendant Drudy Abel answered "No" to the following questions in Part VI, Section A (Governing Body and Management):

> 2. Did any officer, director, trustee, or key employee
> have a family relationship or a business relationship
> with any other officer, director, trustee, or key
> employee?
> 3. Did the organization delegate control over
> management duties customarily performed by or under the
> direct supervision of officers, directors or trustees,
> or key employees to a management company or other
> person?
> 5. Did the organization become aware during the year of
> a significant diversion of the organization's assets?
> 7b. Are any governance decisions of the organization
> reserved to (or subject to approval by) members,
> stockholders, or persons other than the governing body?

139. Despite answering in the negative in Section A, Defendant Drudy Abel answered "Yes" to the following questions in Section B (Policies):

> 12b. Were officers, directors, or trustees, and key
> employees required to disclose annually interests that
> could give rise to conflicts?
> 12c. Did the organization regularly and consistently
> monitor and enforce compliance with the policy? If
> "Yes," describe in Schedule O how this was done.

The only statement in Schedule O is: "The Directors monitor and maintain the conflict of interest policy."

31

**Defendants' Activities were Concealed from Members and Liberty**

140. Liberty's arrangements with the related entities and Individuals  were not arms length transactions as they should have been, but part of a larger self-dealing scheme that diverted member funds from Liberty to its founders in a way contrary to its mission as a purported HCSM and charitable organization.

141. Liberty claims that "with the exception of an administrative fee, money designated by members for cost sharing is never owned or invested by Liberty HealthShare" and "we track the exchange to be certain that those funds are used only to pay shared needs" on its website.  However, those funds were used to pay the Related Entities.

142. Members paid fees additional to the administrative fee, which included portions of the initial membership fee diverted to MCS and additional fees going to CSS, meaning that Liberty members ended up having less sharing power than they were led to believe.

143. As Liberty began to grow rapidly, its sharing power began to decline because it was paying out more expenses than it was collecting in premiums or membership dues. When Liberty realized that its entire scheme was in trouble, third party consultants were hired to find a way to stem the financial bleeding. Up until that point, Liberty had been able to bring in enough new members to subsidize payments to existing members,

similar to a pyramid scheme.

144. As a result of their investigations and communications with each other, third party consultants for Liberty and employees not party to the self-dealing scheme began noticing problems at Liberty.

145. Liberty's affiliated enterprises' costs ran out of control because the relationships were established as a matter of convenience, lack of due diligence, and as part of Liberty's overall scheme to funnel profits from members' pooled funds to the Individual Defendants. There was never any bid process to ensure that Liberty paid market prices for business services expenses. Instead, vendor selection was subject to Defendant Dan Beers's approval and control without any due diligence.

146. As a result, Liberty's sharing power was significantly impaired and the for-profit business service providers owned or controlled by Defendant Dan Beers and the other controlling individuals enriched themselves.

147. In 2017, John Hunt, Liberty's Chief Medical Officer, began uncovering the scheme. As a result, Mr. Hunt tendered his resignation and filed a complaint about Liberty's practices with the Ohio Attorney General ("OAG").

148. Other reports were also drafted and shared with the board or other controlling individuals, warning of improprieties in the company.

33

149. The foregoing observations, recommendations, and concerns were all concealed by Liberty in an effort to continue its scheme, and those that spoke up were swiftly terminated or otherwise silenced in an orchestrated attempt to continue the illegal scheme for as long as possible. As a result, Liberty's members remained unaware of Defendants' self-dealing scheme.

150.  The individual Defendants, along with their long time business partners, contrived, formed, and operated Liberty and its affiliated enterprises as a means to obtain illegal payments and profits in an similar fashion to the earlier BHS scheme, and they misused and continue to misuse Liberty and its related entities to cause consumers like Plaintiff and class members to pay thousands or tens of thousands of dollars in premiums each year that were and are then funneled to Liberty, its principals, and its related entities. Defendants misrepresented the plans' true and legitimate purpose and operation in this material regard, among others.

151.  Defendants knew or should have known that HCSM plans were not contemplated by the law of the State of South Carolina and did not qualify for the exemption provided for in the Affordable Care Act. Defendants nevertheless continues to represent its plans as legal in South Carolina and as qualifying HCSM plans under the Affordable Care and it continues to charge and take significant payments from the class. Defendants have

34

done so as part of its illegal scheme to avoid Federal and State insurance regulations.

152.  The actions of Defendants complained of herein were taken willfully, maliciously, in bad faith, and with the specific intent to cause harm to Plaintiffs and the class, and Defendant's actions have in fact caused the intended harm to Plaintiffs and the class.  Defendants have further taken actions to hide their conversion of funds.

153.  Plaintiff and the class relied upon Defendants material misrepresentations that the plans being offered were legitimate and legal HCSM, as defined under the Affordable Care Act, that would provide medical coverage, rather than the illegal and fraudulent contrivance that they actually are, the true purpose of which was to circumvent State and Federal insurance laws in a scheme to funnel money collected as premiums or "contributions" to Defendants an the individuals who controlled Defendants.

154.  The Defendant's misrepresentation go to the entire legitimacy, nature, legality, and even existence of the plans sold and operated by Defendant. The pervasive nature, extent, and character of Defendant's misrepresentations precluded any customer or potential customer from making a knowing and informed consent or agreement to participate in the illegal insurance plans sold by Defendants that are at issue here.

35

**Liberty as An Insurer Under South Carolina Law**

155.   In the State of South Carolina, "insurance" is defined as "contract were one undertakes to indemnify another or pay a specified amount upon determinable contingencies." S.C. Code Ann. §38-1-20(25).

156.   An insurer is defined as "a corporation... other association... or aggregation of individuals engaging or proposing or attempting to engage as principles in any kind of insurance." S.C. Code. Ann.§38-1-20(33)

157. A "non admitted insurer" is "an insured not license to do an insurance business in the State." S.C. Code Ann.§.38-1-20(43).

158.   A "premium" is "payment given in consideration of a contract of insurance." S.C. Code Ann.§ 38-1-20-(46).

159. "Accident and health insurance" is "insurance of human beings against death or personal injury by accident... against sickness, ailment, and any type of physical disability resulting for accident or disease." S.C. Code Ann.§38-1-20(1).

160.   Licensed accident and health insure's may "issue and deliver service benefit contracts for prepayment of any healthcare service and to make payment directly to the provider of the services" or "issue and deliver contracts of indemnity or contracts providing for payment of money directly to the insured or for them for healthcare services." S.C. Code Ann. §38-71-10.

36

161.  In South Carolina there is no statue allowing an exemption from title 38 in any respect for Health Care Sharing Ministries. Bills were introduced in every session from 2011 to 2019, but none ever passed.

162.  Liberty's Sharing Guidelines clearly outline a plan to indemnify members or pay certain amounts upon determinable contingencies and distribute losses among Liberty's members and therefore meet the definition of insurance under S.C. Code Ann.§38-1-20(25).

163.  Liberty has admitted as much in its letter to the South Carolina Consumer Complaints Commission.  While denying that it is insurance, it admitted that it owed particular amounts of money to particular individuals based on healthcare services provided to its member.

164.  Defendants falsely and misleadingly represented that Liberty was offering Plaintiff and the Class membership in an HCSM when Liberty, its directors, its affiliated persons and affiliated entities knew or should have known that there was no such thing contemplated in the statutes of South Carolina. That the contract it was offering was in fact insurance and that Liberty had not applied for a license to sell insurance. Further that it had not filed as a charitable organization in the State of South Carolina and so was not legally allowed to solicit contributions within the State of South Carolina.

37

165.   As such, regardless of how Liberty defines itself, and no matter how many disclaimers it posts that it is not in fact insurance, its products constitute insurance as contemplated under S.C. Code Ann.§ 38-1-20(25) and is more specifically accident or health insurance as defined by S.C. Ann. § 38-1-20(1).

166.   Regardless of how Liberty defines itself, and no matter how many disclaimers it posts that it is not insurance, its products constitute insurance as contemplated under S.C. Code Ann.§ 38-1-20(25) and is more specifically accident or health insurance as defined by S.C. Ann. § 38-1-20(1).

**Liberty as an Insurer Under Federal Law**

167.   In order to qualify for the Affordable Care Acts definition of a Health Care Sharing Ministry and to avoid the individual mandates tax penalties a Health Care Sharing Ministry must meet the requirements of 26 U.S.C.A.§5000A(d)(2)(B)(ii):

   I.    Is described in §501(c)(3)and is exempt from taxation under §501(a),
   II.   Members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,
   III.  Members of which retained membership even after they develop a medical condition,
   IV.   Which (or a processor of which) has been in existence at all times since December 31st 1999, and medical expenses of its members have been shared continuously without interruption since at least December 31st 1999, and

38

      V.   Which conducts an annual audit which is preformed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

168. Qualified organizations are exempt from various federal regulations such as regulations requiring the provisions of minimal essential coverage and regulation limiting the percentage of member premiums that can be diverted to purposes other than payment for medical costs and activities to improve healthcare qualities.

169. In those states that do not have exemptions for healthcare sharing ministries they claim similar exemptions from regulations and statues.

170. Qualified organization are also eligible to receive tax deductible contributions in accordance with internal revenue code § 170. To qualify as a §501(c)(3) organization (i) the organization must not be organized or operated for the benefit of private interest, and (ii) no part of §501(c)(3) organizations net earnings may adhere to the benefit of any private share holder or individual.

171. As previously set out, Liberty knowingly purchased services from service providers affiliated with the organization, paid above market rates for their services.

172. Members of Liberty Health Share do not share a common set of ethical or religious beliefs. In 2013, Liberty's website

proclaimed "through Liberty Health Share, the opportunity to share medical expenses has been expanded to all Americans regardless of race, religion, or creed."

173.  While the Sharing Guidelines throughout mention Christian principles, presumably meaning the acceptance of Jesus Christ as one's Lord and Savior, that acceptance is not part of the "Statement of Shared Beliefs." Indeed, the requirement is simply that "every individual has a fundamental religious right to worship the God of the Bible in his or her on way." This statement of beliefs is drawn so broadly as to encompass approximately half of the worlds population, including Muslims, Jews, and Christians.

174.  Liberty Health Share has certainly not been in existence since December 31, 1999, nor have any of its predecessor organization.

175.  Neither Liberty nor its related entities and affiliated enterprises actually facilitate the transfer of funds between members as contemplated by the Affordable Care Act. Instead members make payments directly to the Defendants and Defendants, in turn, assume full risk and make payments to members from that pool of money.

176. Both Gospel Light and Calvary Health Share were approved as HCSMs by CMS for several tax years.

177.  Within that approval letter, CMS requires that "if any

change in your status or operation affects any of the information you have submitted to CMS for the purpose of requesting consideration as a health care sharing ministry ... you must notify CMS within 30 days of such change."

178. Gospel Light and Calvary should have notified CMS of the drastic changes regarding Liberty's willingness to enroll all comers for a reevaluation of their qualifications regarding CMS.

179.  The letter from CMS explicitly sets out that CMS's determination is solely regarding an individual's eligibility under the individual shared responsibility payment under the Affordable Care Act.  CMS's determination "does not supersede other relevant state or federal laws that govern the conduct of Gospel Light Mennonite Church Medical Aid Plan."

180.  Further, CMS's determination was based on self-attestations and documents.  Its determination was specifically not a verification of the accuracy of those documents.

### Plaintiff Vicki Lynn's Allegations

181. Plaintiff Vicki Lynn lives in the State of South Carolina, County of Cherokee and has for all relevant periods.

182.  This claims arises out of an insurance contract illegally sold to Vicki Lynn on or about October 1,2017. That contract continued in effect until 2022.

183. Plaintiff Vicki Lynn paid her premium and member dues as instructed.

184. Plaintiff Vicki Lynn had outpatient surgery on November 3, 2021. She followed the requirements of the insurance plan for repayment.

185. Liberty Health Share failed to pay those bills.

186. Vicki Lynn attempted to dispute the fact that they had not paid those bills, escalating all the way to the South Carolina Department of Consumer Affairs.

187. Liberty Health Share, through its legal counsel Andrew Bernat, in its response to that complaint admitted that it was required by its "guidelines" to pay to various providers a total of Ten Thousand Two Hundred and Five Dollars and Seventeen Cents($10,205.17).

188. Throughout its letter to the South Carolina Department of Consumer Affairs, Liberty disclaimed that its policy is insurance. However, whether a contract is one for insurance is determined by South Carolina statutory law, not the disclaimers of the seller of the policy.

189. Liberty further admits that its "sharing time is longer than we would like due to a back log of shareable expenses." Liberty goes on to quote Liberty's own member newsletter, in which it admits to being a Ponzi scheme. "We expect monthly sharing contributions to increase as members select new programs and shareable medical expenses to decrease... {a}s so as a result, we will be able to allocate a portion of

42

monthly share power to address our pre 2022 back log."
Further, " as new members join, we should have an increased share
power to lower the backlog even faster."

190.  To date those payments have not been made.

191.  Liberty's failure to pay bills submitted is an
experience common to all class members, and has harmed Plaintiff
Vicki Lynn.

192.  S.C. Code Ann. § 38-25-360 states that "a person who
assisted or in any manner aided directly or indirectly in the
procurement of the insurance contract is liable to the insured
for the full amount of the claim or loss in the manner provided
by the insurance contract" where the unauthorized insurer fails
to pay any claim or loss.

193.  Liberty is an unauthorized insurer in the State of
South Carolina, sold unauthorized insurance contracts within the
State of South Carolina, and has failed to make payment on claims
or losses incurred within the State.

194.  Each of the Defendants aided either directly or
indirectly as discussed above in the procurement of the
unauthorized insurance contracts sold in the state of South
Carolina.

195.  As such, each Defendant is jointly and severally
liable on each of those claims or losses.  The director
defendants are each liable for those years they were directors

43

## CAUSES OF ACTION

## FOR A FIRST CAUSE OF ACTION

## (Breach of Contract and Covenant of Good Faith and Fair Dealing as to Defendant Liberty)

196. Plaintiffs re-allege and incorporate the preceding allegations as if set forth fully herein.

197. Liberty's Sharing Guidelines constitute a legally enforceable contract with Plaintiff and Class Members.

198. In forming the contract, the parties had a "meeting of the minds" as to its essential terms (including the identity of the parties to be bound, the subject-matter of the contract, the consideration to be exchanged, and the price to be paid).

199. Plaintiffs and the other Class Members fulfilled their contractual obligations during the Class Period.

200. As set forth below, Liberty failed to fulfill its contractual obligations to Plaintiffs and the other Class Members during the Class Period.

201. All contracts also include a duty to comply with the applicable rules of law, which includes a duty of good faith and fair dealing. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

202. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to

be justified.

203. Under its Sharing Guidelines, Liberty impliedly promises to administer the plan in accordance with principles of good faith and fair dealing.

204. Liberty's agreement with Plaintiffs and the other Class Members created the following contractual and good faith obligations:

> (a) calculating the proper amount of monthly contributions needed from members to fund each plan,
> (b) allocating the portion of contributions needed to meet actual administrative expenses, and
> (c) paying legitimate claims to members fully and promptly.

205. Liberty breached the foregoing contractual and good faith obligations by (a) charging members monthly contributions in excess of the amount needed to fund each plan, (b) allocating a greater portion of the contributions to "administrative expenses" than actually needed, (c) funneling much of the money collected as premiums or "contributions" to itself and its principals through affiliated for-profit entity defendants so as to further circumvent and violate federal and state law limiting the distributions, profits, and compensation paid to non-profit principals; and/or by (d) refusing to pay members' legitimate claims, failing to pay them fully, and/or failing to pay them

45

promptly.

206. In addition, Liberty breached its implied covenant of good faith and fair dealing with Plaintiffs and the other Class Members by concealing the foregoing illegal activities while misrepresenting their plans as legitimate HCSM plans that were exempt from State and Federal insurance law.

207. Liberty's ongoing breach of contract and the implied covenant of good faith and fair dealing have caused Plaintiff and the other Class Members to suffer damages in an amount to be proven at trial.

## FOR A SECOND CAUSE OF ACTION

### (Unjust Enrichment as to All Defendants)

208. Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1 through 175 of this complaint as if set forth fully herein.

209. This claim is brought in the alternative to breach of contract in the event the Court finds Liberty's Sharing Guidelines are illegal or otherwise unenforceable contracts.

210. Plaintiffs and Class Members paid Liberty each month for Defendants' purported HCSM plans covering themselves and their families.

211. Liberty retained Plaintiffs' and Class Members' payments, and Plaintiffs and Class Members conferred a direct benefit on Defendants.

46

212. Defendants and their principals used the payments from Plaintiffs and Class Members for their own purposes and profits and to pay for the administrative and marketing costs of running the business, but not for the provision of actual services that were advertised (e.g., coverage for medical bills), as required by law.

213. Plaintiffs and Class Members made their payments as purported "voluntary" "contributions" for what they believed was an HCSM plan, but in reality, Defendants and its affiliated enterprises were not HCSMs, nor were the plans in question HCSM plans. They were illegal insurance contracts as defined by South Carolina law.

214. Rather than apply payments from Plaintiffs and Class Members to pay for participants' covered medical expenses, the covered medical claims of other Class Members, or improving the quality of health care, Defendants kept to themselves a substantial amount of the contributions by Plaintiffs and Class Members primarily as profit despite Liberty's organization as a non-profit charitable organization.

215. Defendants would be unjustly enriched if they were allowed to retain the money Plaintiffs and the Class Members have paid to Defendants, and Defendants should not in equity and good conscience be permitted to keep the funds that Plaintiffs and Class Members paid to Defendants.

47

216. Defendants' inequitable conduct caused Plaintiffs and Class Members to pay to Defendants thousands of dollars or tens of thousands of dollars annually, payments to which Defendants were not legally permitted to receive or retain.

217. The failure to compensate Plaintiffs and Class Members for the extensive benefits conferred upon Defendants renders the transactions between Plaintiffs and the Class Members with Defendants unjust.

218. There being no enforceable contractual provision that expressly controls the subject matter of the instant claims, equity requires that Defendants pay restitution of the amounts paid by  Plaintiffs and Class Members unjustly retained by Defendants, plus interest, punitive damages, and the costs of litigation including attorneys' fees.

## **FOR A THIRD CAUSE OF ACTION**

### **(Conversion as to All Defendants)**

219. Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1
through 215 of this complaint as if set forth fully herein.

220. Plaintiffs and Class Members paid thousands of dollars in monthly premiums to Liberty to obtain coverage for themselves and their families. Plaintiffs and Class Members paid these monthly "contributions" to Defendants to participate in a purported HCSM plan offered by Defendants and to pay for medical

expenses and the medical expenses of other Class Members
and to pay for the reasonable administration costs of the plans.

221. Defendants had and do have a duty to maintain and
preserve Plaintiffs' and Class Members' contributions for their
proper and legally permitted purposes – covering Plaintiffs' and
Class Members' medical expenses, and to prevent their
diminishment through wrongful acts.

222. Liberty has, and without legal right, exercised
dominion and control over Plaintiffs' and Class Members'
"contributions" (i.e. premiums) paid by Plaintiffs and Class
Members that were intended to cover Plaintiffs' and the Class
Members' medical expenses and has wrongfully and without
authority taken for itself, its principals, and certain third
parties a significant portion of those contributions as
administrative costs and profits, rather than using the
contributions for the intended and rightful purpose, all in
hostility to the rights of Plaintiffs and Class Members.

223. The funds that Plaintiffs and Class Members paid to
Defendants constitute specific and identifiable funds earmarked
for a specific purpose.

224. Defendants continue to wrongfully and unlawfully retain
these funds without the authorization of Plaintiffs or Class
Members, and Defendants intend to permanently deprive
Plaintiffs and Class Members of their contributions for

49

Defendants' own profit rather than applying those payments to Plaintiffs' and Class Members' benefits claims or refunding the excess premiums received.

225. As a direct and proximate result of that wrongful conversion, Plaintiffs and the Class Members have suffered and continue to suffer damages.

226. Defendants have converted for their own use the periodic payments made by Plaintiffs and the Class in an amount to be determined at trial, including special, general, and punitive damages, interest, and the cost of litigation, including attorneys' fees.

## FOR A FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty as to Defendant Liberty)

227. Plaintiffs reallege and incorporate the preceding allegations in paragraphs 1 through 223 of this complaint as if set forth fully herein.

228. The transactions and facts governing the relationship between Liberty on the one hand and Plaintiffs and Class Members on the other give rise to a fiduciary or confidentialrelationship between the parties, such that Liberty owed a heightened a duty of the utmost good faith to Plaintiffs and Class Members.

229. Plaintiffs and Class Members demonstrated enormous trust in Liberty — a party of vastly superior power and bargaining position — by contributing millions of dollars every

year for plan coverage in exchange for Liberty's promise to pay
members' medical expenses promptly, to minimizing administrative
costs, and making healthcare decisions in their best interest.

230. Liberty invited and accepted its power, responsibility,
position of trust, and member contributions, and in turn,
Plaintiffs and Class Members weakened their ability to make their
own healthcare choices while reasonably assuming Liberty would
place members' interests above the personal interests of
Defendants and other third parties.

231. Liberty retained substantial discretion over the use of
Plaintiffs' and Class Members' "contributions" and management of
their healthcare by administering claim payments and appeals in a
manner prohibited in insurance contracts.

232. In addition to this self-imposed discretion, Liberty
purported to protect and facilitate the "faith-based," community
structure of the plans offered, thereby elevating Liberty's
relationship with Plaintiffs and Class Members above that of a
traditional commercial relationship.

233. Liberty further elicited trust and reliance from
Plaintiffs and Class Members by misrepresenting that it met the
requirements of an HCSM, and that it had been continuously
operating a sharing ministry since December 1999 (nearly twelve
years before Liberty was created).

234. As fiduciaries, Liberty was required to place members'

51

interests above their own. As a result, Liberty was required to
(i) exercise its position of trust with due care and good faith;
(ii) provide members with all material information; (iii) act
honestly in all respects; (iv) avoid conflicts of interest; and
(v) avoid favoring the interests of anyone else over those of its
members.

235. In violation of those duties, Liberty squandered,
stole, and converted members' contributions in order to enrich
its owners, de facto owner Daniel J. Beers, Beers's family, and
other third parties — all without Plaintiffs' and Class Members'
knowledge, consent, or authorization.

236. Liberty had a fiduciary obligation to use member
contributions for payment of legitimate claims and reasonable
administration costs. Instead, Liberty failed to protect and
favor members' interests and allowed its owners and other third
parties to line their pockets while members were left with
millions of dollars in covered but unreimbursed medical expenses.

237. Liberty violated its duty of candor to members despite
its superior knowledge and proprietary knowledge, skill, and
position of trust, and despite knowing that it was in a position
that requires the utmost good faith.

238. Liberty made materially false and misleading
representations and failed to provide material information that
members and potential members would need to know to make an

52

informed choice about joining or continuing to participate in Liberty's plans, including (without limitation) that: (i) Liberty was formed by, or at the direction, of Daniel J. Beers, who was found liable for fraud regarding similar activity; (ii) it was not authorized to sell HCSM plans; (iii) it was misleading consumers; and (iv) it was engaged in fraudulent advertising and misrepresentations.

239. Plaintiffs and the Class suffered damages as a proximate result of Liberty's fiduciary breaches.

240. Plaintiffs and Class Members each paid monthly hundreds or thousands of dollars and collectively incurred millions of dollars in covered but unreimbursed medical expenses based upon Liberty's breaches and its materially false and misleading information to members.

241. Liberty failed to provide members and potential members with material information they would need to know to determine whether to enter or remain in the plans. Liberty further failed to protect member contributions by misappropriating the funds. Indeed, rather than paying its members healthcare costs, Liberty ignored, declined, rejected, and otherwise failed to cover the claims submitted by its members, as it was required to do, leaving thousands of its members and former members crushed by the burden of impossible medical debt or irrecoverably damaged credit.

242. By reason of the foregoing, Plaintiffs and the Class are entitled to recover from Liberty all damages and costs permitted by law, including actual, nominal, general, and punitive damages, their costs and reasonable attorneys' fees.

### FOR A FIFTH CAUSE OF ACTION

### (Intentional, or Alternatively, Negligent Misrepresentation as to Defendant Liberty)

243. Plaintiffs reallege and incorporate the preceding allegations in paragraphs 1 through 239 of this complaint as if set forth fully herein.

244. Liberty—in its promotional and membership materials, including on its websites, in membership identification cards (the equivalent of an insurance card), and in every Sharing Guideline published during the Class Period—made materially false and misleading representations and failed to disclose material statements that Liberty had a duty to disclose to Plaintiffs and Class Members, including those described below.

245. For example, Liberty falsely and misleadingly represented that:

> a. Liberty is a legitimate HCSM, when it was and is not legitimate;
>
> b. The plans offered by Liberty are not insurance, when the plans are actually illegal insurance contracts;
>
> c. Monthly payments would go to covering members'

54

medical expenses when, in fact, significant portions of payments were being converted by Liberty and the Affiliated Defendants for uses other than paying members' medical expenses; and

d. There was a permissible, legitimate, fair, and meaningful claim dispute resolution procedure when, in fact, the dispute resolution procedures were illegal and were designed and used by Liberty to facilitate Liberty's wrongful denial of covered claims.

246. Liberty had a duty to disclose the foregoing information based on its superior and proprietary knowledge and based on the special relationship, privity, and fiduciary duty Liberty shared with members, including Plaintiffs and the Class.

247. Liberty made the foregoing false and misleading representations and omissions recklessly or with actual knowledge of their falsity.

248. In the alternative, Liberty made the false and misleading representations negligently, as Liberty lacked any ground—much less a reasonable ground—to believe that Liberty's plans were legitimate HCSM plans. Moreover, the plans offered by Liberty were insurance under federal law and state law. Liberty was not authorized as an insurer by federal or state law to sell or issue its insurance plans.

249. Liberty had a duty to not act negligently and to impart

55

accurate information to Plaintiffs and other Class Members due to its relationship with Plaintiffs and Class Members and its superior knowledge of the facts and circumstances underlying the issuance of the plans and Liberty's interactions with courts, regulatory bodies, and attorneys general.

250. Liberty made the foregoing misrepresentations and failed to provide accurate and complete material information to induce Plaintiffs and Class Members to purchase the plans offered by Liberty and to continue paying periodic fees that Liberty then diverted to the Affiliated Defendants, their controlling individuals, and Liberty's de facto owner, Defendant Daniel J. Beers.

251. Plaintiffs and the Class justifiably and reasonably relied on the materially false and misleading representations contained in Liberty's promotional materials, membership materials, and websites, or otherwise acted without the aforementioned material information which Liberty had a duty to disclose.

252. Plaintiffs and Class Members purchased and maintained Liberty's plans and paid periodic premiums reasonably believing that Liberty's plans were legal and legitimate HCSM plans, rather than shams designed to avoid federal and state insurance laws and permit Liberty to loot the plans; that the premiums would be used by Liberty to fund medical expenses; and that Liberty would pay

medical expenses.

253. As a proximate result of Liberty's materially false and misleading misrepresentations and material omissions, Plaintiffs and the Class suffered damages, including many millions of dollars in contributions, as well as unreimbursed medical expenses.

254. Liberty has failed to pay providers all or a portion of numerous overdue medical bills chargeable to Plaintiffs and Class Members without just cause, often subjecting them to harassment, collection efforts, and potential enforcement actions.

255. By reason of the foregoing, Plaintiffs and the other Class Members are entitled to recover from Liberty all damages and costs permitted by law, including actual, nominal, general, and punitive damages, costs, and attorneys' fees.

## FOR A SIXTH CAUSE OF ACTION

### (Accounting as to Defendant Liberty)

256. Plaintiffs reallege and incorporate the preceding allegations in paragraphs 1 through 252 of this complaint as if set forth fully herein.

257. Plaintiffs and the other Class Members are entitled to a full accounting and disclosure from Liberty of all administrative expenses and other payments to persons and entities from 2013 to the present.

258. Plaintiff and the Class Membership are further entitled to a full accounting of the "ShareBox" account or accounts, to whom those accounts paid money, and the structure by which they were held and dispersed by Liberty.

259. Plaintiffs and putative Class Members seek a Court Order requiring Liberty to produce said accountings according to law and for the public's benefit.

260. Plaintiffs and the other Class Members also seek disgorgement of any excessive and/or unnecessary expenses or other payments issued by Liberty to the detriment of Plaintiffs and the other Class Members, from either the Corporation's operating account or the "ShareBox" account or accounts it claims not to own, but controls.

## FOR A SEVENTH CAUSE OF ACTION

## Civil Conspiracy as to all Defendants

261. Plaintiffs reallege and incorporate the preceding allegations in paragraphs 1 through 256 of this complaint as if set forth fully herein.

262. Each of the Defendants took part in a civil conspiracy to sell insurance products in the state of South Carolina that evaded the requirements of South Carolina Law.

263. This caused special damages to the Plaintiff and class membership in that they were denied the host of statutory and regulatory benefits required by authorized insurance products.

264.   Each Defendant knew or should have known that insurance products are regulated by each state and were on notice that the insurance products that they aided in selling to Plaintiffs were insurance products and, as such, were subject to additional regulation.

265.   By selling unauthorized insurance products in the State of South Carolina, the Defendants were further able to avoid the oversight of the South Carolina Department of Insurance.

266.   Each Defendant further took part in a civil conspiracy to avoid registering as a charitable entity in the State of South Carolina.

267.   Each Defendant acted in such a manner with the intent to harm the Plaintiffs by denying them the regulatory and statutory protections these Plaintiffs and their elected officials have determined are necessary to ensure that the citizens of South Carolina are protected from unscrupulous self-dealers.

268.   These special damages are in addition to those already pled.

<u>**FOR AN EIGHTH CAUSE OF ACTION**</u>

<u>**Declaratory Judgment**</u>

269.   The Plaintiff realleges and reincorporates the proceeding allegations in paragraphs 1 through     Of this

59

complaint as if fully set forth herein.

270.  This cause of action is brought pursuant to the federal uniform declaratory judgement act, §28 U.S.C. 2201 et.seq; and the South Carolina Uniform Declaratory Judgement Act, S.C. code 15-53-10 et.seq;

271.  Justiciable controversy exists by and among the parties in which the parties have a legal and actual interest and which is right for resolution.

272.  The Plaintiff and the class seek a declaratory judgement declaring that Liberty Health Share and the other Defendants to this litigation are in fact participating in illegal and unauthorized health insurance sales without appropriate licenses and authority to do so.

## FOR A NINTH CAUSE OF ACTION

### Injunctive Relief

273.  Plaintiff realleges and reincorporates the proceeding allegations in paragraphs 1 through 273 of this complaint as if set forth fully herein.

274.  Plaintiff is informed and believes that the class will suffer harm and actually damage to the extent that the Defendants are allowed to continue seeking perspective applicants and or otherwise engaging in the acts and practices of which Plaintiff complains in South Carolina.

275.  Plaintiff is therefore informed and believes that she

and the class are entitled to temporary and permanent injunctions granting the relief sought herein above pursuant to FRCP Rule 65.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief against Defendants, jointly and severally:

1. That this Court certify the Class defined in Plaintiff's complaint;

2. That this Court appoint Plaintiff as Representative of the Class;

3. That this Court appoint Knie & Shealy Law Offices lead counsel for the Class;

4. That this Court find and declare that Defendants are estopped from denying that the products that Liberty sold are contracts for insurance based on its response to the South Carolina Department of Consumer Affairs;

5. In the alternative, that this Court find and declare that Liberty's unauthorized health insurance plans were and are illegal contracts for health insurance under South Carolina Law and that Liberty and the other defendants were participating in the sale of those illegal health insurance contracts;

6. That this Court find and declare that each individual defendant, to include the Uncompensated Directors, is personally liable on each unauthorized insurance contract sold in South Carolina during his or her association with Defendant Liberty or

61

the related entities as required by S.C. Code Ann. § 38-25-360;

7. That this Court issue an immediate preliminary and permanent injunction enjoining Liberty and its agents(and its officers, partners, agents, servants, representatives, salespeople, employees, successors or assigns, under the names they presently use or any other names, through any corporate or other device, and those in active concert and participation with the Defendants, directly or indirectly) from engaging in the acts and practices of which Plaintiffs complain in South Carolina;

8. That this Court impose a constructive trust over Liberty's assets and business opportunities that were usurped by Liberty and the Related Entities, to include the "sharebox" accounts;

9. That this Court order the reformation of Liberty's and the Related Entities' board and executive leadership to the extent needed to prevent the illegal activities complained of by Plaintiffs from continuing;

10. That this Court order that the Individual Defendants are prohibited from selling or transferring assets of Liberty, entering into contracts on its behalf, acting as signatory on any financial checking, savings or other financial accounts of Liberty, or deciding issues of compensation to themselves, each other or any member of their families, to include the "sharebox" accounts;

11. That this Court find and declare each Defendant jointly and

severally liable on all counts applicable to each Defendant and Liberty's CEOs or directors personally liable upon finding Liberty an unauthorized insurer pursuant to S.C. Code §38-25-360;

12. An award on behalf of Vicky Lynn and putative Class Members against the Defendants, jointly and severally, of actual damages, pre-judgment interest, punitive damages, restitution, attorneys' fees and costs, and such other items as may be allowed to the maximum extent permitted by law.

13. That this Court order the rescission of the unauthorized health insurance plans and restitution of all premiums received from members of the proposed class, including interest; require that all bills be paid under the contractual terms ; and reform each prior year's insurance contract to conform to the Affordable Care Act and South Carolina Law, requiring payments for the fair value of the minimum essential coverage requirement found in the Affordable Care Act and the requirements imposed by S.C. Code Ann. § 38-71-10 et seq. for all previous years.

*Signature Page to Follow*

```
                                    KNIE & SHEALY

                                    /s/ Patrick E. Knie
                                    _____
                                    Patrick E. Knie
                                    pat@knieshealy.com
                                    Federal I.D. No. 2370
                                    Matthew W. Shealy
                                    matt@knieshealy.com
                                    Federal I.D. No. 12823
                                    S.C. Bar No. 77724
                                    P.O. Box 5159
                                    250 Magnolia Street
                                    Spartanburg, S.C.  29304
                                    Telephone No. (864) 582-5118
                                    Telefax No.   (864) 585-1615

                                    ATTORNEYS FOR PLAINTIFF

January 31, 2023
```

64