IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| VICKI LYNN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 5:24-cv-00153-DAR |
| | ) | |
| vs. | ) | CLASS ACTION AMENDED COMPLAINT |
| | ) | |
| Daniel J. Beers, Ronald | ) | (JURY TRIAL DEMANDED) |
| Beers, Daniel Beers, Jr., | ) | |
| Druzilla J. Abel, Thomas | ) | Judge David A. Ruin |
| Fabris, Brandon Fabris, | ) | |
| Douglas D. Behrens, | ) | |
| Dale E. Bellis, Larry | ) | |
| Foster, Dorsey Morrow, | ) | |
| Don Brewer, Durlin | ) | |
| Beachy, Everett Yoder, | ) | |
| Robert Klinestiver, | ) | |
| Phyllis Ingram, Stephen | ) | |
| Doukas,Joseph Gingerich, | ) | |
| Ryan Mast, Scot Burris, | ) | |
| Individual Defendants, | ) | |
| and Gospel Light | ) | |
| Mennonite Church Medical | ) | |
| Aid Plan, National | ) | |
| Coalition of Health Care | ) | |
| Sharing Ministries, The | ) | |
| MedicalCost Savings | ) | |
| Solution, LTD, Cost | ) | |
| Sharing Solutions, LLC, | ) | |
| and Savnet International, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the plaintiff, VICKI LYNN, who hereby files this Class Action Amended Complaint against the above-named Defendants, and who would respectfully show unto the Court as follow:

1

## **Nature of the case**

1. At no time in human history has so many health conditions been so treatable or so costly. Since 2000, healthcare cost has escalated much faster than general inflation.

2. In order to deal with the rising cost of healthcare in the potentially ruinous financial consequences of a health crisis, health insurance has been mandated for most american individuals since 2014.

3. This mandate comes with an exception, though. Buried within the affordable care act(ACA),at 26 U.S.C.code § 5000(A)(d)(2)(B), is an exception which allows an individual to become a member of a Healthcare Sharing Ministry (HCSM) rather than purchasing traditional health insurance.

4. HCSMs originated in the Mennonite and Amish communities. These communities pooled funds in order to help members shoulder individual healthcare burdens.

5. In light of this religious origin HCSMs must meet some requirements. They must be non-profits under the IRS code, they must share a common set of ethical religious beliefs and shar medical expenses among members, members must retain membership even after they develop a medical condition they must have been in existence at all times since December 31, 1999, and they must conduct an annual audit performed by an independent certified public accounting firm that is available to the public upon

2

request.

6. These HCSMs, however, are under non of the requirements placed on traditional insurance through the ACA. As such they are able to avoid requirements like caps on administrative costs and coverage of pre-existing conditions. Futher, they are able to disallow repayments based on "morality."

7. In closely knit communities, HCSMs have been run admirably. However because of the lack of regulation, the lack of oversight by federal authorities, and the incorrect assertion that HCSMs are not subject to state insurance regulation, HCSMs have become a vehicle for fraud.

8. At the leading edge of this fraud is Gospel Light Mennonite Church Medical Aid Plan, Inc. (Gospel Light) And its many affiliated, insider companies and individuals, particularity the Beer's family and their friends.

9. Gospel Light and its affiliated individuals and companies were all created between the passage of the ACA and its coming into force in order to take advantage of the HCSM exception. Because Gospel Light was under no obligation to comply with the ACAs requirements, it was able to advertise much lower premiums then traditional health insurance.

10. Gospel Light's insiders, Plaintiffs allege, created numerous companies in order to drain funds from Gospel Light's subscribers. They further made payments to those companies out of

funds that were to be segregated for the payment of medical procedures. They did this while selling policies that required Gospel Light to indemnify another upon determinable contingencies making its polices an insurance policy under South Carolina law.

11. The contracts with the affiliated companies and people were not arms length transactions, as a result, were far and access of fair market value for the services provided.

12. While making those payments, Gospel Light has failed to pay medical bills that it plainly is required to pay according to its unauthorized insurance polices and, in fact, has acknowledge or due from it.

13. Gospel Light came under investigation 2017 from the Ohio Attorney General. As a result of the settlement from 2022, Liberty was required to sever ties with most of the former directors and insiders.

14. However, despite electing a new board, Gospel Light has continued to sell unauthorized insurance products in the state of South Carolina while not paying out valid insurance claims, in violation of South Carolina law.

15. At the same time, Gospel Light and its affliated entities have never registered as charitable agencies in the state of South Carolina or registered as an insurance company in the state of South Carolina. As a result there has been no governmental oversight of Gospel Light and its affiliated

4

entities in the State of South Carolina. This has allowed Gospel Light to siphon millions of dollars from the legitimate helath insurance market of South Carolina. It is further placed tremendous strain on healthcare providers in the state of South Carolina because bills have not been paid leading to escalating costs for those responsible health insurers in South Carolina.

## PARTIES

16.    Plaintiff, VICKI LYNN, is a South Carolina resident residing in Gaffney, South Carolina 29340.  Plaintiff became a member of Liberty HealthShare on or about October, 2017.  She left Liberty HealthShare in 2022.

17. Defendant Gospel Light Mennonite Church Medical Aid Plan Incorporated ("Gospel Light"), a Virginia non-profit corporation with its principal place of business in Ohio.  Gospel Light does business as Liberty Healthshare.

18. Defendant National Coalition of Health Care Sharing Ministries ("National Coalition") was an Ohio non-profit corporation with its principal place of business in Ohio.  It derived all or substantially all of its revenue from Gospel Light for provisioning administrative services to Gospel Light.

19. Gospel Light and National Coalition worked in such concert that they are referred to in this amended complaint jointly as Liberty.

20. Defendant The Medical Cost Saving Solution, LTD. d/b/a

5

Med Cost Solution, LLC ("MCS") is an Ohio for profit limited liability company that is affiliated with Liberty founded on or about June 29, 2015. MCS is owned by Thomas Fabris.  MCS holds itself out as leading the health sharing industry in providing service for claim repricing, balance bill advocacy, and self pay patient legal support.

21. Defendant Cost Sharing Solution, LLC ("CSS") is an Ohio for profit limited liability company founded by Defendant Daniel J. Beers, JR and Brandon Fabris. CSS manages clients sales campaigns by serving as a call center sales and support hub. CSS also provides other marketing services, such as radio broadcasting search engine marketing, etc. to Liberty.

22.  Defendant Savnet International LLC ("SAVNET") is an Ohio based for profit limited liability Company founded by Douglas Behrens, one of Liberty's founders. Savnet holds itself out as a pharmacy and prescription discount program and was one of Liberty's service providers.

23. Defendant Daniel J Beers is, upon information belief, an individual residing in the state of Ohio, County of Stark. He is Defendants Daniel J. Beers, JR and Ron Beers's father and Drudy Abel's brother. Defendant Daniel J. Beers exerted  de facto control over Liberty's day to day and financial transactions, as well as activities of the Related Defendants.  He was also employed by Liberty at various times in the past.

6

24. Defendant Ronald Beers is, upon information belief, an individual residing in the State of Ohio, County of Summit. He is Defendant Daniel J. Beers son, brother to Defendant Daniel Beers Jr, and Drudy Abel's Nephew. He currently shares ownership in CSS with Defendant Brandon Fabris and Defendant Daniel Beers, II.

25. Defendant Daniel Beers II is, upon information and belief, an individual residing in the State of Ohio, County of Stark. He is Defendant Daniel J. Beers son, brother to Defendant Ronald Beers, and Drudy Abel's nephew. Defendant Daniel Beers JR also co-owns Defendants CSS, an affiliated company to Liberty.

26. Defendant Druzilla ("Drudy") Abel is, upon information and belief, an individual residing in the State of Ohio, County of Stark. She is also Defendant Daniel J. Beers's sister and aunt to Defendants Ronald Beers, Daniel Beers, JR. Defendant Drudy Abel is a founder of Liberty and was an officer and/or Director of Liberty at relevant times in the past.

27. Defendant Thomas Fabris is, upon information and belief, an individual residing in the State of Ohio, County of Stark. He is also Defendant Brandon Fabris's father. Defendant Thomas Fabris owns Defendant MCS, a single member LLC that is an affiliated company to Liberty. Defendant Thomas Fabris is, at times, referred to as "MCS's controlling individual."

28. Defendant Brandon Fabris is, upon information and belief, an individual residing in the State of Ohio, County of

7

Stark. He is also Defendant Thomas Fabris's son. Defendant
Brandon Fabris co-owns Defendant CSS, an affiliated company to
Liberty.

29. Defendant Douglas Behrens is, upon information and
belief, an individual residing in the State of Ohio, County of
Summit. He is a former Director of Liberty and Defendant Dale
Bellis's former business partner. Defendant Douglas Behrens also
owns Defendants Savnet, an affiliated company to Liberty.
Defendant Douglas Behrens is, at times, referred to as "SavNet's
controlling individual."

30. Defendant Dale E. Bellis is, upon information and
belief, an individual residing in the State of Ohio, County of
Stark. He was Liberty's CEO until discharged. Upon information
and belief, Defendant Dale Bellis has also been Defendant Daniel
J. Beers JR life long friend.

31. Defendant Larry Foster is, upon information and belief,
an individual residing in the State of Ohio, County of Stark. He
is a former director of Liberty and a former CEO of Liberty.  As
CEO, he approved or continued many of the Related Entity
transactions discussed below.

32. Dorsey Morrow is, upon information and belief, an
individual residing in the State of Ohio, County of Portage. He
is the current Chief Executive Officer of Liberty.

33. Defendant Don Brewer is, upon information and belief,

8

an individual residing in the State of Indiana, county of Hancock. He is the current chairman of the Board of Liberty.

34.  Defendant Durlin Beachy is, upon information and belief, an individual residing in the State of Virginia, County of Albemarle. He is a current Board Member of Liberty.

35.  Defendant Everett Yoder is, upon information and belief, an individual residing in the State of Tennessee, county of Henry. He a current Board Member of Liberty.

36.  Defendant Robert Klinestiver is, upon information and belief, an individual residing in the State Indiana, County of Hancock. He is a current Board member of Liberty.

37.  Defendant Phyllis Ingram is, upon information and belief, an individual residing in Alabama, County of Montgomery. She is or was a Board member of Liberty.

38.  Defendant Stephen Doukas is, upon information and belief, an individual residing in the State of Florida, County of Pinellas. He is or was a board member of Liberty.

39.  Defendant Joseph Gingerich is, upon information and belief, an individual residing in the state of Virginia, County of Greene.  He is a former Director of Liberty.

40.  Defendant Ryan Mast is, upon information and belief, an individual residing in the State of Virginia, County of Albemarle.  He is a former director of Liberty.

41.  Defendant Scot Burris is, upon information and belief,

9

an individual residing in the State of Indiana, County of Marion. He is a former director and Chairman of the Board of Liberty.

42.  Defendants Stephen Doukas, Phyllis Ingram, Robert Klinestiver, Everett Yoder, Don Brewer, Durlin Beachy, Joseph Gingerich, Ryan Mast, and Scot Burris are or were all directors of Liberty and are, at times, referred to as "Director Defendants."  Phyllis Ingram, Stephen Doukas, Robert Klinestiver Everett Yoder, and Don Brewer are, at times, referred to as the "current Director Defendants." Robert Klinestiver, Everett Yoder, Don Brewer, Durlin Beachy, Joseph Gingerich, Ryan Mast, and Scot Burris are all at times referred to as the "former Director Defendants" to the extent that they were directors for years prior to the Ohio Attorney General Settlement dated March 15, 2021.

43.  Defendants Dorsey Morrow, Drudy Abel, Dale E. Bellis, and Larry Foster are at times referred to as "Executive Defendants."

44.  Defendants Ronald Beers, Donald Beers II, and Brandon Fabris are, at times, referred to as "CSS's controlling individuals."

**JURISDICTION AND VENUE**

45.  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and the Defendants are citizens of different States and the amount in controversy exceeds the sum

of value of 75,000.00 dollars, exclusive of interest and cost.

46.  This court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1331, The Class Action Fairness Act, 28 U.S.C. § 1332(d), and 28 U.S.C. § 1367. Upon information belief, the matter in controversy exceeds $5,000,000, exclusive of interest and costs and this matter is a class action in which certain Class Members are citizens of states other than certain Defendant's States of residence.

47.  This Court has jurisdiction over all Defendants because each Defendant is an entity that conducts business and maintains operations in this district, or were involved in a civil conspiracy that had substantial effects in this jurisdiction. They advertised, wrote, and sold and continue to advertise, write and sell, illegal insurance products in the State of South Carolina.

48.  All Defendants conspired to have those illegal insurance products have a substantial effect in the State of South Carolina.

49.  All Defendants have sufficient minimum contacts with South Carolina as to render the exercise of jurisdiction by the South Carolina Courts permissible under traditional notions of fair play and substantial justice and S.C. Code Ann. § 36-2-803(A)(1), (A)(3), (A)(6), (A)(7), § 38-25-510(a), and §38-61-10.

50.  Jurisdiction and venue are also proper pursuant to 18

11

U.S.C. § 1965(b) because the ends of justice require that certain persons who reside outside the Districts that this action began in or was transferred to be brought before the Court.

51.  Venue in this Court is proper pursuant to 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391. A substantial portion of the transactions and wrongs complained of herein occurred in this district.

52.  Jurisdiction and venue are proper as the sale of the insurance policy at issue giving rise to this cause of action occurred in this jurisdiction, as did the advertising that led to the sale.

## CLASS ALLEGATIONS

53.  The preceding paragraphs are incorporated by reference as though fully set fourth herein.

54.  Plaintiff asserts the allegations raised herein on behalf of herself and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, as representative of a class of persons similarly situated. The class is defined as follows:

> All current, former, and future participants in Liberty plans in South Carolina who have made or will make periodic payments to Liberty to participate in plans presented as healthcare sharing ministries. Excluded from the class or officers, directors, and employees of the Defendants. Also excluded are the individual Defendants. The class period is the maximum length of time not time-barred beginning no earlier than 2013.

12

55. While the exact number of class members is presently unknown to the Plaintiff, class membership is ascertainable based upon the records maintained by the Defendants. Upon information and belief. Plaintiff contends that the class includes hundreds if not thousands of members. As such the class is so numerous that joiner of all members in a single proceeding is impracticable.

56. The claims of the named Plaintiff is typical of the claims of the class members generally. Plaintiff and other class members have been deprived of the benefit of the bargain into which they entered with the Defendants. They have also been the victims of a civil conspiracy by said Defendants. That civil conspiracy is currently ongoing. The Plaintiff and class members have been denied benefits due them, and/or they have received less then they were promised, and have all purchased illegal insurance contracts under the laws of the State of South Carolina.

57. There exist questions of law and fact common to all members. Without limitation, these common questions include:

a. Whether Liberty's plans were healthcare sharing ministry plans under the Affordable Care Act, 26 U.S.C.A. § 5000A(d)(2)(B)(ii);

b. Whether Liberty's plans were illegal insurance plans under South Carolina Law Title 38, Chapter 71;

13

C.  Whether Liberty's plans were falsely represented to not be insurance under the Laws of the State of South Carolina and the Affordable Care act;

d.  Whether Defendants violated Federal or State Laws by offering and selling their plans to Plaintiffs in the class or by administering those plans;

e.  Whether Defendants knew or should have known that the plans they sold to Plaintiff and the class members were not healthcare sharing ministry plans under the Affordable Care Act;

f.  whether Defendants knew that the plans that they sold to Plaintiff and the class members constituted insurance under South Carolina Law;

g.  Whether Plaintiff and class members have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

h.  Whether Liberty's uniform policy of conditioning membership on making at least the "suggested monthly share amount" qualifies as voluntary contribution as well as valid consideration for its standard membership contract;

i.  The nature, scope, and operations of Defendants wrongful polices;

j. Whether Defendants were agents, each of the other, operating, acting, and otherwise conducting and comporting themselves, with express or implied consent, for the benefit and

14

in the name of one another, within the terms and limits and to the extent, whether expressed or implied, of the agency relationship that existed between them, for the purposes of undertaking and accomplishing the actions complained of herein;

k. Whether Plaintiffs in the class were third party beneficiaries of contracts between Defendant entities facilitating Defendant's fraudulent scheme;

l.  Whether Defendants had a policy in practice of fraudulently charging persons supra-market rates;

m. Whether MCS, CSS, and SavNet are Liberty's alter egos;

n. Whether Defendants' conduct inflated the amounts that Plaintiffs and the class members paid for medical cost "sharing" by more than they would owe if Defendants acted lawfully;

o.  Whether Defendants engaged in self dealing;

p.  Whether Defendants engaged in prohibited transactions;

q.  Whether Defendants breached contractual obligations to Plaintiffs and class members;

r.  Whether Defendants were unjustly enriched;

s.  Whether and to what extent Liberty's board members, current and former, as well as executives, current or former, are personally liable for insurance contracts sold to Liberty's

15

members, Plaintiff, and the putative class members;

t.  Whether the refusal by Liberty to pay benefits due under these contracts resulted from the insurer's bad faith or unreasonable actions in breach of an implied covenant of good faith and fair dealing arising in those contracts;

u.  Whether Defendant's association furnished a vehicle for the commission of two or more predicate acts;

v.  Whether Defendants enterprise was engaged in or its activities affected, interstate commerce pursuant to 18 U.S.C.§1962;

w.  Whether Defendants have engaged in mail and / or wire fraud;

x.  Whether Defendants participated in and controlled the conduct and affairs of a common enterprise through a pattern of racketeering activity;

y.  Whether Defendant's enterprise is an enterprise within the meaning of 18 U.S.C.§1961(4);

z.  Whether Defendants conducted or participated, directly or indirectly, in the conduct of the enterprises affairs, for the purposes of 18 U.S.C.§ 1962(c);

aa.  Whether Defendants have used or invested income from their racketeering activities to establish or operate their enterprise in violation of 18 U.S.C. § 1962 (a);

bb.  Whether Defendants conducted or participated in

the affairs of their enterprise through a pattern of racketeering activity in violation of 18 U.S.C.§ 1962 (c);

   cc.  Whether Defendants overt and / or predicate acts in furtherance of their violations of 18 U.S.C. §§ 1962 (a) and (c) proximately caused injury to the Plaintiffs and Class Members;

   dd.  The nature and extent of damages and other remedies owed to Class Members by virtue of Defendant's conduct; and

   ee.  Whether this Honorable Court can enter declaratory injunctive, or other equitable relief.

   57.  Plaintiff will protect fairly and adequately the interest of the class she seeks to represent. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the proposed Class. Plaintiff's counsel is experienced and competent in the prosecution of complex class litigation.

   58.  Certification pursuant to Fed.R.Civ.P. 23(b)(2) is proper for the class defined above because the maintenance of separate actions by individual members of the class would create a risk of varying adjudications with respect to interpretations of uniform policy terms and obligations that would establish incompatible standards of conduct for the Defendants as the parties opposing class. Furthermore, certification under Fed.R.Civ.p.23(b)(2) is proper because adjudications with respect

17

to individual class members would, as a practical matter, be dispositive of the interest of other class members not a party to the adjudications or would substantially impair or impede their abilities to protect their interest. In addition, the Defendants, as the parties opposing the class, have acted or refused to act on grounds generally applicable to the class thereby making relief appropriate with respect to the class as a whole.

59. While Plaintiffs specifically state that certification to Fed.R.Civ. 23(b)(2) is proper by itself for this entire action because monetary damages in the form of restitution is merely incidental to the declaratory and injunctive relief sought, Plaintiffs alternatively allege that certification of the class defined above is likewise proper under Fed.R.Civ.P. 23(b)(3). Specifically, common issues of fact and law as set forth above predominate over any individual issues that may exist. Furthermore, a class action is superior to other available methods for a fair and efficient adjudication of this action as a class. The interest of judicial economy favor adjudication of the claims alleged herein on a class basis and adjudication of this action as a class is properly manageable. The interest of judicial economy favor adjudication of the claims alleged hereon on a class basis rather than an individual basis, especially where, as here, the amount of damages for each claim are small compared to the burden and expense that would be incurred if each

18

claim was litigated individually.

60.  The Defendants have acted on grounds generally applicable to the class by selling insurance policies to members in South Carolina without being subject to the regulation imposed by State Law and Federal Law, they have administered monthly premium payments, deductible amounts, and  paid out claims based on sharing guide lines that are frankly analogous to an insurance contract. They have engaged in a civil conspiracy to sell illegal insurance contracts to their members. They have diverted funds in excess of those allowable by law for insurance companies. They have refused to pay claims properly presented to them. They have done these thing in breach of their fiduciary duties, in bad faith, and in breach of their contracts. For this reason Plaintiff, on behalf of herself and all other similar situated, asks that Defendants be enjoined from continuing their dishonesty in bad claims practices and that Defendants be ordered to pay the benefits promised in the policy.

## **FACTUAL ALLEGATIONS**

61.  The paragraphs 1-60 are incorporated by references though fully set forth by herein.

### *Liberty HealthShare's Corporate History*

62.  On November 14, 2000, The Mindala Family Foundation filed its Articles of Incorporation in Ohio.

63.  Gospel Light Mennonite Church Medical Aid Plan

19

Incorporated was incorporated by Durlin Beachy and Joseph Gingerich on June 3, 2014 in the Commonwealth of Virginia.

64. Light Your World Ministries Inc. was incorporated in Indiana on or about March 2, 2005. Larry Foster of Lebanon Indiana is listed as the director in all subsequent filings.

65. Liberty Healthshare Council, Inc. was incorporated by Defendant Dale E. Bellis, Defendant Douglas Behrens, and Defendant Druzilla J. Abel in the State of Ohio on June 15, 2012.

66. On July 29, 2013, the Mindala Family Foundation acquired the tangible and intangible assets of Liberty Healthshare Council, Inc. and Christian Financial Death Assistance, a dba of Light Your World Ministries.

67. As a result of that transaction, Liberty Healthshare Council, Inc. dissolved and the Mindala Family Foundation changed its name to Liberty Health Share, Inc.

68. At sometime between July 29, 2013, and November 25th 2013, Defendant Dale Bellis became the executive director of the combined entity Liberty Health Share Inc.

69. Liberty Health Share applied to become a Health Care Sharing Ministry on November 21, 2013 and on March 17, 2014. It withdrew its application on February 11, 2015.

70. At some point between June 9, 2014, and December 3rd 2014, Defendant Dale Bellis became the chairman of Gospel Light Mennonite Church Medical Aid Plan.

20

71.  On December 5, 2014, Gospel Light received a license as a foreign nonprofit corporation in Ohio.

72.  Gospel Light applied to become a Health Care Sharing Ministry on January 29, 2014. It was approved on or about March 31, 2014.

73.  On June 15, 2015, Gospel Light applied to use the trade name "Liberty Health Share." Defendant Dale Bellis signed the application for the trade name and the document allowing Gospel Light to use that trade name on behalf of Liberty Health Share Inc. Defendant Druzilla Abel also signed that document on behalf of Liberty Health Share Inc.

74.  On July 13, 2015, Liberty Health Share, Inc changed its name to the National Coalition of Healthcare Sharing Ministry Inc. (National Coalition). Defendant Dale Bellis continued as the Chairman for both Gospel Light and National Coalition.

75.  National Coalition's new business purpose was to provide Health Care Sharing Ministries with administrative support.

76.  On September 9, 2014, Calvary Health Care Sharing Ministry was incorporated with Everett Yoder as its director in Virginia with a principal place of business in Tennessee. It never filed as a foreign corporation doing business in Tennessee. It is still in existence today.

77.  Calvary Christian Fellowship, dba Calvary Health Care

21

Sharing Ministry, applied to become an HCSM on May 2, 2014. It was approved on June 11, 2014.

78. None of these corporations have filed as nonprofit charities, corporations, solicitors, or insurers in the State of South Carolina.

79. According to Liberty's website, Calvary Health Care Sharing Ministry, Gospel Light Mennonite Church Medical Aid Plan, Inc, and Christian Financial Death Assistance "unified" in 2014.

80. At various times, Liberty has claimed to be a "reorganization of an existing group that has been sharing cost since 1988," or that "Liberty Health Share is a healthcare sharing ministry of an existing group (Gospel Light Mennonite Church Medical Aid Plan, Inc.)that has been sharing cost since 1995."

81. In 1982, an Ohio nonprofit corporation called Barberton Rescue Mission begin a news letter called the Christian Brotherhood News Letter, with the goal of matching member's healthcare needs to other members willing to pay some portion of those needs.

82. Defendant Daniel J. Beers and Jeffery A. Beers incorporated a for-profit corporation called Benevolent Health Systems, Inc. (BHS) on March 31, 1995.

83. BHS operated a service for the Christian Brotherhood News Letter whereby it would contact medical service providers on

behalf of the members of the newsletter and request that those providers discount member bills based on the Christianity of the member. BHS had a contract that paid it fifteen percent of the amount each providers bill is reduced.

84. At the time of the contract's signing as well as during the time of its execution, Defendant Daniel Beers was employed by the Barberton Rescue Mission, making that contract one between affiliated entities. Both Defendant Daniel J. Beers and Jeffery A. Beers were related to a trustee of the Barberton Rescue Mission, Ronald Beers.

85. On or about December 11, 2000, the Attorney General of Ohio and two trustees of the board of directors of the Barberton Rescue Mission sued Defendant Daniel J. Beers, Jeffery Beers, Benevolent Health Systems Inc and others alleging a number of causes of action, including breaches of fiduciary duty.

86. A trial was held in Summit County Ohio on May 4,2004, ended with verdicts on May 25, 2004, and final judgement was entered by Judge Cosgrove on March 29, 2005. Verdict was entered against Defendant Daniel J. Beers as to breaches of fiduciary duty to Barberton Rescue Mission and conversion. Verdict was entered against the for profit corporation Benevolent Health Systems, Inc. on breaches of fiduciary duty, conversion, civil fraud, and unjust enrichment.

87. Liberty's website often touts the experience of its

23

founders without pointing to the truth behind that experience.

88. Neither Liberty nor any of its predecessors have been in existence since 1999, nor have its members been sharing healthcare costs among themselves since 1999.

89. Upon information and belief, Defendant Daniel J. Beers has exercised dominion and control over Liberty and its related entities through his familial and friendship connections. He has further received payments from Liberty and its Related Entities.

***Liberty's Insurance Plans***

90. When signing up for a Liberty plan, a member must submit an application and provide a medical history, as with the typical insurance underwriting process. If a member does not submit a complete or accurate medical history, she can be denied, or can be "retroactively denied" membership.

91. Upon approval, the first two months premiums go to the corporation. An additional twelve percent of each premium is paid to administrative fees.

92. As with traditional medical insurance, there are three tiers of coverage available to Liberty members, the names of which have changed throughout the years.

93. Each tier has a different premium amount and deductible, called a "suggested monthly sharing amount" and an "annual unshared amount."

94. The "suggested monthly share amount" is determined by

the provider based on the program level of the member. It further requires membership dues be paid at the time of application and the first day of each members annual renewal month.

95. The sharing guidelines in the section entitled " submit dues and suggested monthly shares," state that:

> Each month a sharing member is assigned a specific need in which to share. By submission of the Suggested Monthly Share Amount, the member instructs Liberty Health Share to assign his/her contribution as prescribed in these Guidelines, which set forth the conditions upon which Sharing member medical expenses will be shared. By participation in the Program, the Sharing Member both accepts those conditions as enforceable and binding within the in program for the assigning of his/her contribution and designates Liberty Health Share as the final authority for the interpretation of these guidelines.

96. The premium is not "voluntary" except in the sense all payments in exchange for services are voluntary. If the member fails in these monthly and annual payments, he or she is immediately suspended, retroactively as of the first day of the month.

97. As such, coverage is conditioned on timely payment and providing a truthful accounting of one's medical history. In exchange for accurately filling out the application and payment of monthly fees, a Liberty member remains eligible to have her expenses paid by Liberty upon certain determinable contingencies set out in the sharing guidelines.

98.   In addition, Liberty assigns the contribution according to its own discretion, rather than being a passive entity that simply matches members willing to shoulder some of another member's burden to those burdened members.

99.   The sub accounts are referred to by Defendants as a "share box." Liberty claims not to own, operate, or otherwise control those accounts.

100.  Plaintiffs and class members are not allowed to withdraw money from the share box, nor are they allowed to direct the payment of the funds in that "share box" to various other members.  They exercise no dominion or control over the proceeds in the "share box."

101.  By contrast, Liberty writes checks on those accounts and otherwise disposes of the money in the accounts, allegedly for the benefit of its members.  Money in these accounts has been spent on nonadministrative costs of the Related Entities.

102.  These accounts are not reported on the company's Form 990 as custodial or escrow accounts.  They are treated within the audited financial statements of the company, but are dealt with summarily and as a single account, rather than on an account by account basis.

103.  Liberty determines, in its sole discretion, to what "needs" the premium is applied.

104.  Liberty further allows that, where insufficient

26

premiums are available to satisfy the eligible costs over a sixty day period, premiums may be increased to satisfy those "needs," in its own discretion.

105.   Liberty further administers a deductible, termed an "annual unshared amount," in each plan.   It further disallows any medical expenses other than accidents, acute injury, or illness for the first two months of membership.

106.   The sharing guidelines detail the coverage available for preventative care, primary care, chronic maintenance, labs and diagnostic, tele-medicine, prescription drug programs, urgent care, specialty care, hospitalization, surgery, emergency room visits, and more.

107.   Liberty also administers a network of physicians it calls "suggested providers" through a directory on its website. These providers are designated in the directory with a green check mark and the indication of "Suggested Provider."  These suggested providers are ones "who charge fair and reasonable industry rates."

108.   All of these features are features of a traditional insurance plan, not the Health Care Sharing Ministries upon which the exemption for the Affordable Care Act was based.

109.   Liberty's members do not play a roll in determining benefit guidelines, determining procedure for allocating benefits, determining which medical expenses will be covered, or

27

determining who gets paid benefits and when. Instead, Liberty
alone, through the Executive Defendants and the Director
Defendants, develops membership guidelines, determines which
medical expenses is covered, and retains total discretion to
determine which claims will be paid, without member input. While
Liberty holds itself out as an organization that facilitates the
sharing of healthcare cost in reality Liberty, like a traditional
insurer, is the sole and final arbiter of the plans and benefits
claims, and its members play no material role in managing the
plans.

**Related Entities**

110. Despite Liberty's designation as a nonprofit
corporation, it conducts and conducted business through related
entities and affiliated for-profit enterprises in a scheme to
funnel profits to the Affiliated Defendants.

111. The Affiliated Defendants are illegal constructs of
board members, former board members, and/or family members whose
relationships were not properly disclosed in order to charge
over-market prices for services, thereby significantly eroding
the portion of member contributions available for "sharing."

112. Defendant Cost Sharing Solution, LLC ("CSS") is an Ohio
for profit limited liability company founded by Defendant Daniel
J. Beers, JR and Brandon Fabris. CSS is a contractual service
provider to Liberty that holds itself out as conducting

28

"[m]arketing, call center operations, and technology consulting on behalf of HealthCare [sic] Sharing Ministries," and as such is an affiliated company to Liberty and necessarily intertwined with its operations. CSS also provides other marketing services, such as radio broadcasting, search engine marketing, etc. to Liberty.

113.  Defendant Daniel Beers, Jr. owns a majority interest in CSS and is a non-voting member.

114. Defendant Ronnie Beers is an employee of CSS.

115. According to Liberty's 2017 Form 990, CSS was Liberty's highest paid independent contractor with compensation totaling $17,859,288, nearly seven times the amount of the next highest paid independent contractor for professional services.

116.  By 2020, CSS's compensation rose to $20,712,716, twenty-nine times more than any other service provider and nearly 40% of Liberty's membership dues and fees. CSS and Liberty also shared the $250,000 cost to be lead sponsors of CPAC 2020, the Conservative Political Action Conference.

117.  Upon information and belief, CSS acts as "a producer of insurance" as that term is defined by SC Code Ann. § 38-43-10.

118.  Upon information and belief, CSS has not complied with any of the requirements of Chapter 43 of Title 38 of the South Carolina Code of Laws.

119. Defendant, The Medical Cost Saving Solution, LTD. d/b/a Med Cost Solution, LLC ("MCS") operates a claims repricing

business in which it endeavors to reduce the bills Liberty is required to pay.  This is in substance acting as a third party administrator as defined by SC Code Ann. § 38-51-10.

120.  Upon information and belief, MCS is not presently, nor has it ever been, registered within the state of South Carolina as a foreign corporation doing business here.

121.  Upon information and belief, MCS is not licensed under SC Code Ann. §38-51-20, has not posted the surety bond required by SC Code Ann. §38-51-30, nor has it ever attempted to have its agents licensed as insurance adjustors under Title 38, chapter 47 of the South Carolina Code of Laws.

122.  Upon information and belief, MCS does not and has not complied with the requirements of South Carolina's statutes and regulations with respect to administrators of insurance benefits plans nor has it required its agents to comply with the statutes and regulations regarding adjustors.

123.  Prior to MCS's involvement with Liberty, bill repricing services were provided by Legacy Management Group.

124.  In 2014, Legacy Management Group received a total of $204,432 according to National Coalition's Form 990.  National Coalition is an affiliated entity of Liberty.

125.  In 2015, Legacy Management Group received $701,338.

126.  Legacy Management Group was led by Dale E. Bellis, Jim Mindala, and Douglas D. Behrens.  Dale E. Bellis in 2014 was the

30

Chief Executive Officer of Liberty.  He was in that position for as long as Legacy Management Group was involved with Liberty. Jim Mindala and Douglas D. Behrens were both former directors of Liberty.

127.  While National Coalition's Form 990 does declare the conflict of interest and say that Bellis is divesting himself of his interest in Legacy Management Group, it does not list that conflict for 2014.  It does not list a conflict at all with Mindala or Behrens.

128.  Defendant Bellis did divest himself of the company, but to Thomas Fabris, the father of Brandon Fabris, co-owner of CSS with Defendant Daniel Beers, Jr. Defendant Thomas Fabris then dissolved Legacy Management Group on or about September 9, 2015.

129.  Thomas Fabris, as the owner of Medical Cost Saving Solution, Ltd., received $763,608 in 2015 for claims repricing services.

130.  Defendant Savnet International LLC ("SAVNET") was founded by Douglas Behrens, one of Liberty's founders, and holds itself out as a pharmacy and prescription discount program and was one of Liberty's service providers.

131.  Defendant Douglas Behrens founded SavNet on or about March 24, 2016.

132.  Liberty requested proposals from vendors on or about May, 2016, just 2 months after the foundation of SavNet.

133. SavNet provided an overview of a prescription discount program to Liberty prior to July 1, 2016, just 3 months after its incorporation.

134.  On July 1, 2016, SavNet entered into a "discount aggregate program marketing agreement" with Alliance HealthCard, Inc. on July 1, 2016.

135.  A "health savings discount program affinity agreement" was then entered into on September 1, 2016 between MCS and SavNet to enroll Liberty HealthShare participants in SavNet's program. 5 months and 8 days after one of the founders of Liberty founded SavNet.

136.  This process was a mere sham orchestrated by the Individual Defendants to allow Defendant Behrens to profit from the success of Liberty.  In fact, SavNet's website is http://savnet4liberty.com.

137.  Should a member wish to cancel her enrollment in SavNet, then she would need to "in writing, notify SavNet at P.O. Box 5157 Fairlawn, OH 44334 or by calling 1-855-58-LIBERTY (1-855-585-4237)." This phone number is actually a phone number to contact Liberty.

138.  These related entities further received money, from the shareboxes of members for "non administrative expenses." It is frankly unclear how those payments were accounted for with IRS or if they were so accounted.  These related entities were not

32

medical service providers and so should not have received moneys from accounts designated for member medical needs.

139. Liberty contracted with a related entity, The National Coalition of Health Care Sharing Ministries, Inc. to provide selective supportive services. Those costs totaled $58,723,816 for the 2018 calendar year. The two organizations are related because their boards of directors have common members and a common corporate history. The National Coalition of Health Care Sharing Ministries, Inc. reported on its 2018 audited financial statements that about 26% of their expenses were used for management and general purposes and about 74% of their expenses were used for direct program purposes.

140. All or substantially all of Liberty's dues revenue was paid to the National Coalition of Health Care Sharing Ministries, Inc. and all or substantially all of the National Coalition's was derived from Liberty.

141. Upon Information and belief, Defendant Daniel Beers exercised de facto control of both entities. The Executive Defendants and former Director Defendants allowed him to do so in order to participate in the scheme.

142. As part of a settlement with the Ohio Attorney General's Charitable Law section, National Coalition of Healh Care Sharing Ministries, Inc. dissolved itself.

143. As part of a settlement with the Ohio Attorney

General's Charitable Law Section, Gospel Light as Liberty was required to allow all contracts with SavNet, MCS, and CSS to either lapse or not be extended beyond March 21, 2022.

144. Despite these related party transactions, Liberty's website claims "[o]ur Board of Directors is the final authority that oversees the entire organization. Our Board Members are independent, non-compensated decision makers who follow a strict conflict of interest policy."

145. The Director Defendants are integral in selling these insurance products to the public because they are offered as impartial governors of a benevolent heath care entity.

146. The Director Defendants, both current and former, have allowed their company to act as an nonprofit insurance company in the State of South Carolina without having registered as a nonprofit or an insurance company.

147. Upon information and belief, Defendant Daniel J. Beers has exercised control of these Related Entities and has received payments from them.

148. These entities, and their controlling individuals, knew or should have known that they were operating within South Carolina without complying with South Carolina Law.

149. These entities, and their controlling individuals, knew or should have known that Liberty was operating an insurance business and that they were aiding and abetting that insurance

34

business.

150.   These entities and their controlling individuals knew
or should have known that the representations that they made on
behalf of Liberty were false or misleading and that the Plaintiff
and the Class would rely to their detriment on those false and
misleading statements.

151. With respect to Liberty's Form 990 for 2019, Defendant
Drudy Abel, Liberty's CEO at the time, disclosed the following
family relationships on Schedule L:

> Cheryl Foster (Spouse), Administrative Services,
> Matthew Bellis (Son), Administrative Services,
> Pamela Johnson (Sister), Administrative Services,
> Druzilla B Heim (Daughter), Administrative Services,
> and Emily Braucher-Abel (In-Law), Administrative
> Services.

152. Contrary to the foregoing disclosures, Defendant Drudy
Abel answered "No" to the following questions in Part IV
(Checklist of Required Schedules) of Liberty's Form 990 for 2019:

> 25b. Is the organization aware that it engaged in an
> excess benefit transaction with a disqualified person
> in a prior year, and that the transaction has not been
> reported on any of the organization's prior Forms 990
> or 990-EZ?
> 28. Was the organization a party to a business
> transaction with one of the following parties (see
> Schedule L, Part IV instructions for applicable filing
> thresholds, conditions, and exceptions):
> > a. A current or former officer, director, trustee,
> > key employee, creator or founder, or substantial
> > contributor?
> > b. A family member of any individual described in
> > line 28a?
> > c. A 35% controlled entity of one or more
> > individuals and/or organizations described in
> > lines 28a or 28b?

35

> 34. Was the organization related to any tax-exempt or taxable entity?
> 35a. Did the organization have a controlled entity within the meaning of section 512(b)(13)?

153. Also, in contrast to the foregoing disclosures in Liberty's Form 990 for 2019, Defendant Drudy Abel answered "No" to the following questions in Part VI, Section A (Governing Body and Management):

> 2. Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee?
> 3. Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person?
> 5. Did the organization become aware during the year of a significant diversion of the organization's assets?
> 7b. Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body?

154. Despite answering in the negative in Section A, Defendant Drudy Abel answered "Yes" to the following questions in Section B (Policies):

> 12b. Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts?
> 12c. Did the organization regularly and consistently monitor and enforce compliance with the policy? If "Yes," describe in Schedule O how this was done.

The only statement in Schedule O is: "The Directors monitor and maintain the conflict of interest policy."

**Defendants' Activities were Concealed from Members and Liberty**

36

155. Liberty's arrangements with the related entities and Individuals  were not arms length transactions as they should have been, but part of a larger self-dealing scheme that diverted member funds from Liberty to its founders in a way contrary to its mission as a purported HCSM and charitable organization.

156. Liberty claims that "with the exception of an administrative fee, money designated by members for cost sharing is never owned or invested by Liberty HealthShare" and "we track the exchange to be certain that those funds are used only to pay shared needs" on its website.  However, those funds were used to pay the Related Entities.

157. Members paid fees additional to the administrative fee, which included portions of the initial membership fee diverted to MCS and additional fees going to CSS, meaning that Liberty members ended up having less sharing power than they were led to believe.

158. As Liberty began to grow rapidly, its sharing power began to decline because it was paying out more expenses than it was collecting in premiums or membership dues. When Liberty realized that its entire scheme was in trouble, third party consultants were hired to find a way to stem the financial bleeding. Up until that point, Liberty had been able to bring in enough new members to subsidize payments to existing members, similar to a pyramid scheme.

37

159. As a result of their investigations and communications with each other, third party consultants for Liberty and employees not party to the self-dealing scheme began noticing problems at Liberty.

160.  Liberty's affiliated enterprises' costs ran out of control because the relationships were established as a matter of convenience, lack of due diligence, and as part of Liberty's overall scheme to funnel profits from members' pooled funds to the Individual Defendants. There was never any bid process to ensure that Liberty paid market prices for business services expenses. Instead, vendor selection was subject to Defendant Dan Beers's approval and control without any due diligence.

170.  As a result, Liberty's sharing power was significantly impaired and the for-profit business service providers owned or controlled by Defendant Dan Beers and the other controlling individuals enriched themselves.

171. In 2017, John Hunt, Liberty's Chief Medical Officer, began uncovering the scheme. As a result, Mr. Hunt tendered his resignation and filed a complaint about Liberty's practices with the Ohio Attorney General ("OAG").

172. Other reports were also drafted and shared with the board or other controlling individuals, warning of improprieties in the company.

173. The foregoing observations, recommendations, and

concerns were all concealed by Liberty in an effort to continue its scheme, and those that spoke up were swiftly terminated or otherwise silenced in an orchestrated attempt to continue the illegal scheme for as long as possible. As a result, Liberty's members remained unaware of Defendants' self-dealing scheme.

174.  The individual Defendants, along with their long time business partners, contrived, formed, and operated Liberty and its affiliated enterprises as a means to obtain illegal payments and profits in an similar fashion to the earlier BHS scheme, and they misused and continue to misuse Liberty and its related entities to cause consumers like Plaintiff and class members to pay thousands or tens of thousands of dollars in premiums each year that were and are then funneled to Liberty, its principals, and its related entities. Defendants misrepresented the plans' true and legitimate purpose and operation in this material regard, among others.

175.  Defendants, to include the current and former Director Defendants, knew or should have known that HCSM plans were not contemplated by the law of the State of South Carolina and did not qualify for the exemption provided for in the Affordable Care Act. Defendants nevertheless continue to represent Liberty's plans as legal in South Carolina and as qualifying HCSM plans under the Affordable Care and it continues to charge and take significant payments from the class. Defendants have done so as

39

part of its illegal scheme to avoid Federal and State insurance regulations.

176.  The actions of Defendants complained of herein were taken willfully, maliciously, in bad faith, and with the specific intent to cause harm to Plaintiffs and the class, and Defendant's actions have in fact caused the intended harm to Plaintiffs and the class.  Defendants have further taken actions to hide their conversion of funds.

177.  Plaintiff and the class relied upon Defendants material misrepresentations that the plans being offered were legitimate and legal HCSM, as defined under the Affordable Care Act, that would provide medical coverage, rather than the illegal and fraudulent contrivance that they actually are, the true purpose of which was to circumvent State and Federal insurance laws in a scheme to funnel money collected as premiums or "contributions" to Defendants an the individuals who controlled Defendants.

178.  The Defendant's misrepresentation go to the entire legitimacy, nature, legality, and even existence of the plans sold and operated by Defendant. The pervasive nature, extent, and character of Defendant's misrepresentations precluded any customer or potential customer from making a knowing and informed consent or agreement to participate in the illegal insurance plans sold by Defendants that are at issue here.

40

**Liberty as An Insurer Under South Carolina Law**

179.  In the State of South Carolina, "insurance" is defined as "contract were one undertakes to indemnify another or pay a specified amount upon determinable contingencies." S.C. Code Ann. §38-1-20(25).

180.  An insurer is defined as "a corporation... other association... or aggregation of individuals engaging or proposing or attempting to engage as principles in any kind of insurance." S.C. Code. Ann.§38-1-20(33)

181. A "non admitted insurer" is "an insured not license to do an insurance business in the State." S.C. Code Ann.§.38-1-20(43).

182.  A "premium" is "payment given in consideration of a contract of insurance." S.C. Code Ann.§ 38-1-20-(46).

183. "Accident and health insurance" is "insurance of human beings against death or personal injury by accident... against sickness, ailment, and any type of physical disability resulting for accident or disease." S.C. Code Ann.§38-1-20(1).

184.  Licensed accident and health insure's may "issue and deliver service benefit contracts for prepayment of any healthcare service and to make payment directly to the provider of the services" or "issue and deliver contracts of indemnity or contracts providing for payment of money directly to the insured or for them for healthcare services." S.C. Code Ann. §38-71-10.

41

185.   In South Carolina there is no statue allowing an exemption from title 38 in any respect for Health Care Sharing Ministries. Bills were introduced in every session from 2011 to 2019, but none ever passed.

186.   Liberty's Sharing Guidelines clearly outline a plan to indemnify members or pay certain amounts upon determinable contingencies and distribute losses among Liberty's members and therefore meet the definition of insurance under S.C. Code Ann.§38-1-20(25).

187.   Liberty has admitted as much in its letter to the South Carolina Consumer Complaints Commission.  While denying that it is insurance, it admitted that it owed particular amounts of money to particular individuals based on healthcare services provided to its member.

188.   Defendants falsely and misleadingly represented that Liberty was offering Plaintiff and the Class membership in an HCSM when Liberty, its directors, its affiliated persons and affiliated entities knew or should have known that there was no such thing contemplated in the statutes of South Carolina. That the contract it was offering was in fact insurance and that Liberty had not applied for a license to sell insurance. Further that it had not filed as a charitable organization in the State of South Carolina and so was not legally allowed to solicit contributions within the State of South Carolina.

42

189.  As such, regardless of how Liberty defines itself, and no matter how many disclaimers it posts that it is not in fact insurance, its products constitute insurance as contemplated under S.C. Code Ann.§ 38-1-20(25) and is more specifically accident or health insurance as defined by S.C. Ann. § 38-1-20(1).

***Liberty as an Insurer Under Federal Law***

190.  In order to qualify for the Affordable Care Act's definition of a Health Care Sharing Ministry and to avoid the individual mandates tax penalties a Health Care Sharing Ministry must meet the requirements of 26 U.S.C.A.§5000A(d)(2)(B)(ii):

    I.    Is described in §501(c)(3)and is exempt from taxation under §501(a),

    II.   Members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

    III. Members of which retained membership even after they develop a medical condition,

    IV.  Which (or a processor of which) has been in existence at all times since December 31st 1999, and medical expenses of its members have been shared continuously without interruption since at least December 31st 1999, and

    V.   Which conducts an annual audit which is preformed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

191.  Qualified organizations are exempt from various federal regulations such as regulations requiring the provisions

43

of minimal essential coverage and regulation limiting the
percentage of member premiums that can be diverted to purposes
other than payment for medical costs and activities to improve
healthcare qualities.

192.  In those states that do not have exemptions for
healthcare sharing ministries, they claim similar exemptions from
regulations and statues.

193.  Qualified organization are also eligible to receive
tax deductible contributions in accordance with internal revenue
code § 170. To qualify as a §501(c)(3) organization (i) the
organization must not be organized or operated for the benefit of
private interest, and (ii) no part of §501(c)(3) organizations
net earnings may adhere to the benefit of any private share
holder or individual.

194.  As previously set out, Liberty knowingly purchased
services from service providers affiliated with the organization,
paid above market rates for their services.

195.  Members of Liberty Health Share do not share a common
set of ethical or religious beliefs. In 2013, Liberty's website
proclaimed "through Liberty Health Share, the opportunity to
share medical expenses has been expanded to all Americans
regardless of race, religion, or creed."

196.  While the Sharing Guidelines throughout mention
Christian principles, presumably meaning the acceptance of Jesus

44

Christ as one's Lord and Savior, that acceptance is not part of the "Statement of Shared Beliefs." Indeed, the requirement is simply that "every individual has a fundamental religious right to worship the God of the Bible in his or her on way." This statement of beliefs is drawn so broadly as to encompass approximately half of the worlds population, including Muslims, Jews, and Christians.

197.   Liberty Health Share has certainly not been in existence since December 31, 1999, nor have any of its predecessor organization.

198.   Neither Liberty nor its related entities and affiliated enterprises actually facilitate the transfer of funds between members as contemplated by the Affordable Care Act. Instead members make payments directly to the Defendants and Defendants, in turn, assume full risk and make payments to members from that pool of money.

199. Both Gospel Light and Calvary Health Share were approved as HCSMs by CMS for several tax years.

200.   Within that approval letter, CMS requires that "if any change in your status or operation affects any of the information you have submitted to CMS for the purpose of requesting consideration as a health care sharing ministry ... you must notify CMS within 30 days of such change."

201. Gospel Light and Calvary should have notified CMS of

45

the drastic changes regarding Liberty's willingness to enroll all comers for a reevaluation of their qualifications regarding CMS.

202.   The letter from CMS explicitly sets out that CMS's determination is solely regarding an individual's eligibility under the individual shared responsibility payment under the Affordable Care Act.  CMS's determination "does not supersede other relevant state or federal laws that govern the conduct of Gospel Light Mennonite Church Medical Aid Plan."

203.  Further, CMS's determination was based on self-attestations and documents.  Its determination was specifically not a verification of the accuracy of those documents.

**Defendant's Violations of the Law**

204.   Defendants conspired to sell inherently unfair and deceptive health care plans to members and failed to provide them with the coverage the purchasers believed they would receive. Defendants claimed the health care plans were not "insurance" in order to avoid both oversight by the state insurance commissioner and the minimum requirements mandated by the ACA. At the same time, Defendants created the health care plans to appear like health insurance that would actually provide meaningful coverage for the purchasers' health care needs.

205. As set forth herein, Defendants engaged in a fraudulent scheme in violation of federal and state law by self-dealing through undisclosed conflicts to enrich themselves to the

detriment of Plaintiffs and the other putative Class Members. Specifically, Defendants conspired to establish supra-market rates for medical cost-sharing through companies affiliated with Liberty (such as MCS, CSS, and SavNet) that were run by family members and others with close ties to Liberty, including certain of the Individual Defendants as set forth herein. Defendants engaged in self-dealing and conflicts of interest to extract improper, unfair, usurious, unwarranted, supramarket, and unreasonable fees from Plaintiffs and putative Class Members in order to profit themselves by reducing Plaintiffs' and putative Class Members' benefits. Defendants' wrongful acts, omissions and prohibited transactions include (without limitation) the following:

a. All of the Defendants other than the current Directors, individually and jointly, conspired to allow Defendants Daniel J. Beers, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers, Jr., and Douglass D. Behrens, to exert concealed (yet real and material) authority over Liberty's day-to-day and financial decision-making power regarding its cost-sharing operations—similar to the actions and scheme undertaken taken by Daniel J. Beers that led to his civil and criminal liability to BHS and Barberton Rescue Mission in 2004;

b. Defendants, other than the current Directors, conspired to conceal and then failed to disclose to the public

47

the active and material power and influence Defendants Daniel J.
Beers, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers,
Jr., and Douglass D. Behrens exert over all of the corporate
Defendants and their operations, resulting in substantial
financial benefits to Defendants Daniel J. Beers and other
Defendants, other than the current Director Defendants, all to
the detriment of Plaintiffs and putative Class Members;

c. Defendants openly encouraged—but then concealed from
the public — material conflicts of interest with service
providers controlled by family members and other close relations
that inflated Defendants' financial benefit to the detriment of
Plaintiffs and putative Class Members; and

d. Through self-dealing and concealing conflicts of
interests, Defendants were able to create, maintain, and charge
supra-market and usurious premium rates to members, resulting in
a financial enrichment to Defendants at Plaintiffs' and putative
Class Members' expense.

e. The Current Director Defendants have continued to
sell unauthorized insurance products in South Carolina, charging
premiums, but failing to cover the expenses required by those
insurance contracts.

206. Plaintiffs bring this action to recover the improper,
unwarranted, usurious, and unreasonable fees charged to
Plaintiffs and all Class Members. Separately, Plaintiffs seek

48

declaratory and injunctive relief to reform Defendants' business structures, relationships, and practices and procedures to ensure their unlawful scheme and conspiracy does not continue.

### Piercing the Corporate Veil

207. The alter-ego corporate forms of Defendants CSS, MCS and SavNet are shams and should be disregarded because their corporate forms are mere shells, instrumentalities, and conduits used as unfair devices to achieve inequitable results, and adherence to the fiction of the separate existence of the corporations would sanction a fraud or promote an injustice.

208. The corporate fiction has been utilized and promoted by these alter-ego corporations as a sham to perpetrate a fraud for the direct personal benefit of their respective controlling Individual Defendants.

209. Each Controlling Individual Defendant organized, operated, and maintained all of his/her wholly owned subsidiaries, as described herein, as mere shells, instrumentalities, and conduits. There was such unity between the Controlling Individual Defendant and his/her alter-ego corporate entit(ies) that the individuality or separateness of the alter-ego corporation(s) never existed or ceased to exist because of the unity of interest and ownership.

210. Each of the Defendant corporations described as an "alter-ego" herein was owned, managed, and/or operated as the

alter ego of a Controlling Individual Defendant, and is each the
alter ego for the other with respect to the execution and
performance of the scheme and enterprise that is central to the
claims of Plaintiffs and the Class.

211. The following facts regarding the operations of
Defendants CSS, MCS, and SavNet support disregarding the
corporate fiction: (1) corporate formalities for all of these
Defendants were ignored and were not observed; (2) property was
not kept separate and apart between the parent corporations and
the wholly owned subsidiary corporations; (3) direct deposits
were made into bank accounts of the alter-ego corporations, which
were controlled by the Controlling Individual Defendants and
deposited into the Controlling Individual Defendant's accounts;
(4) the Controlling Individual Defendant at all times maintained
100% financial interest in her corporations and maintained
control over the subsidiary corporations on an operational basis
by appointing all officers, directors, and top management and
supervisory employees of each subsidiary corporation; (5) the
corporations are and were used or established for the business
purposes of their respective Controlling Individual Defendant,
and are or were the means by which the Controlling Individual
Defendant conducted her business; (6) the corporations'
operations, functions, and facilities were not reasonably
capitalized in light of the nature and risk of the ostensible

50

business of the corporations; (7) the capital and credit line used to fund and operate the corporations' operations, function, and facilities were solely that of the Controlling Individual Defendant; and (8) the payment of salaries and wages to the workers of the corporations and operations were made from the bank accounts and funds of the Controlling Individual Defendant.

212. Plaintiffs further allege that at all relevant times, the Controlling Individual Defendants, together with the Corporate Defendants, as applicable, have operated as a single business enterprise to achieve a common business purpose. The Controlling Individual Defendants and any wholly owned corporations were not operated as separate and individual entities, but rather they integrated and commingled their resources to achieve a common business purpose and conducted their operations such that: (1) the corporations were used or established for the business purposes of the Controlling Individual Defendant, and were the means by which the Controlling Individual Defendants conducted all their business; (2) a single and common board of directors and the same members existed between the Controlling Individual Defendants and alter-ego corporations; (3) the same centralized and consolidated account and financial reporting was used by both the Controlling Individual Defendants and the alter-ego corporation(s) for both internal and external purposes, such as for filing all required

51

reports with the U.S. Department of the Treasury and Internal Revenue Service; and (4) the Controlling Individual Defendants paid the wages of all officers, directors, employees, agents, and representatives of the alter-ego corporations.

213. The Controlling Individual Defendants have intentionally operated all alter-ego corporations in a manner that left the alter-ego corporations without assets sufficient to satisfy the claims of Plaintiffs and the Class, by taking complete control and possession of the alter-ego corporations' revenues and receivables as soon as they were received or accrued. All monies received as proceeds pursuant to and in performance of contracts by the alter-ego corporations were maintained and received by the Defendant alter-ego corporations to fund Controlling Individual Defendants' operations and were not maintained at the corporate level.

## **Plaintiff Vicki Lynn's Allegations**

214. Plaintiff Vicki Lynn lives in the State of South Carolina, County of Cherokee and has for all relevant periods.

215.  This claims arises out of an insurance contract illegally sold to Vicki Lynn on or about October 1,2017. That contract continued in effect until 2022.

216. Plaintiff Vicki Lynn paid her premium and member dues as instructed.

217. Plaintiff Vicki Lynn had outpatient surgery on November

3, 2021. She followed the requirements of the insurance plan for repayment.

218.  Liberty Health Share failed to pay those bills.

219.  Vicki Lynn attempted to dispute the fact that they had not paid those bills, escalating all the way to the South Carolina Department of Consumer Affairs.

220.  Liberty Health Share, through its legal counsel Andrew Bernat, in its response to that complaint admitted that it was required by its "guidelines" to pay to various providers a total of Ten Thousand Two Hundred and Five Dollars and Seventeen Cents($10,205.17).

221.  Throughout its letter to the South Carolina Department of Consumer Affairs, Liberty disclaimed that its policy is insurance. However, whether a contract is one for insurance is determined by South Carolina statutory law, not the disclaimers of the seller of the policy.

222.  Liberty further admits that its "sharing time is longer than we would like due to a back log of shareable expenses." Liberty goes on to quote Liberty's own member newsletter, in which it admits to being a Ponzi scheme. "We expect monthly sharing contributions to increase as members select new programs and shareable medical expenses to decrease... {a}s so as a result, we will be able to allocate a portion of monthly share power to address our pre 2022 back log."

Further, " as new members join, we should have an increased share power to lower the backlog even faster."

223.   To date those payments have not been made.

224.   Liberty's failure to pay bills submitted is an experience common to all class members, and has harmed Plaintiff Vicki Lynn.

225.   S.C. Code Ann. § 38-25-360 states that "a person who assisted or in any manner aided directly or indirectly in the procurement of the insurance contract is liable to the insured for the full amount of the claim or loss in the manner provided by the insurance contract" where the unauthorized insurer fails to pay any claim or loss.

226.   Liberty is an unauthorized insurer in the State of South Carolina, sold unauthorized insurance contracts within the State of South Carolina, and has failed to make payment on claims or losses incurred within the State.

227.   Each of the Defendants aided either directly or indirectly as discussed above in the procurement of the unauthorized insurance contracts sold in the state of South Carolina.

228.   As such, each Defendant is jointly and severally liable on each of those claims or losses.  The director defendants are each liable for those years they were directors

**CAUSES OF ACTION**

## FOR A FIRST CAUSE OF ACTION

## (Breach of Contract and Covenant of Good Faith and Fair Dealing as to Defendant Liberty)

229. Plaintiffs re-allege and incorporate the preceding allegations as if set forth fully herein.

230. Liberty's Sharing Guidelines constitute a legally enforceable contract with Plaintiff and Class Members.

231. In forming the contract, the parties had a "meeting of the minds" as to its essential terms (including the identity of the parties to be bound, the subject-matter of the contract, the consideration to be exchanged, and the price to be paid).

232. Plaintiffs and the other Class Members fulfilled their contractual obligations during the Class Period.

233. As set forth below, Liberty failed to fulfill its contractual obligations to Plaintiffs and the other Class Members during the Class Period.

234. All contracts also include a duty to comply with the applicable rules of law, which includes a duty of good faith and fair dealing.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

235. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.

236. Under its Sharing Guidelines, Liberty impliedly promises to administer the plan in accordance with principles of good faith and fair dealing.

237. Liberty's agreement with Plaintiffs and the other Class Members created the following contractual and good faith obligations:

(a) calculating the proper amount of monthly contributions needed from members to fund each plan,

(b) allocating the portion of contributions needed to meet actual administrative expenses, and

(c) paying legitimate claims to members fully and promptly.

238. Liberty breached the foregoing contractual and good faith obligations by (a) charging members monthly contributions in excess of the amount needed to fund each plan, (b) allocating a greater portion of the contributions to "administrative expenses" than actually needed, (c) funneling much of the money collected as premiums or "contributions" to itself and its principals through affiliated for-profit entity defendants so as to further circumvent and violate federal and state law limiting the distributions, profits, and compensation paid to non-profit principals; and/or by (d) refusing to pay members' legitimate claims, failing to pay them fully, and/or failing to pay them promptly.

239.  In addition, Liberty breached its implied covenant of good faith and fair dealing with Plaintiffs and the other Class Members by concealing the foregoing illegal activities while misrepresenting their plans as legitimate HCSM plans that were exempt from State and Federal insurance law.

240.  Liberty's ongoing breach of contract and the implied covenant of good faith and fair dealing have caused Plaintiff and the other Class Members to suffer damages in an amount to be proven at trial.

**FOR A SECOND CAUSE OF ACTION**

**(Breach of Contract – Recission as to Defendant Liberty)**

241.  The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim.

242.  With regard to every class member during the class period, the Defendant sold the class members policies of insurance which it was not authorized to sell.

243.  The fact that the Defendant was not authorized to enter into contracts with the class members is so fundamental of a breach of the contract that the only proper remedy is a rescission of each and every such contract and a return to each and every class member of the monies paid to the Defendant Liberty.

**FOR A THIRD CAUSE OF ACTION**

**Personal Liability as to each individual Defendants**

57

244. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim.

245. S.C. Code Ann. § 38-25-360 states that "In the event of failure of an unauthorized insurer to pay any claim or loss within the provisions of the insurance contract, a person who assisted or in any manner aided directly or indirectly in the procurement of the insurance contract is liable to the insured for the full amount of the claim or loss in the manner provided by the insurance contract."

246. The Directors in this case, both former and current, approved the document that is alleged to be the insurance contract in this case.

247. The Directors, both former and current, knew or should have known that the insurance product that Liberty was selling was unauthorized in the State of South Carolina.

248. The Directors, both former and current, by approving the insurance contract and allowing it to be sold in South Carolina while they knew or should have known that it was not authorized, have "aided in the procurement of the insurance contract" within the terms of S.C. Code Ann. § 38-25-360.

249. Liberty's website further holds out its board of Directors as being impartial and uncompensated and thus trustworthy as the "final authority" overseeing the entire company.  This is offered as an additional reason potential

members should trust Liberty with their health care needs.

250. The other individual Defendants have also "aided in the procurement of the insurance contract" by creating and managing the conspiracy as discussed above.

251. Each Corporate Defendant was part of the advertising and package of services provided by Liberty, such as they were.

252. Each Controlling Individual took part in the marketing of Liberty and providing the apparatus by which funds were drained from Liberty.

253. Each Executive Defendant directed funding to affiliated and related entities, took part in various schemes to hide the sham that Liberty was from the general public and regulatory bodies, took part in the creation of Liberty itself, and benefitted from the draining of the nonprofit.

**FOR A FOURTH CAUSE OF ACTION**

**(Unjust Enrichment as to All Defendants)**

254. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim.

255. This claim is brought in the alternative to breach of contract in the event the Court finds Liberty's Sharing Guidelines are illegal or otherwise unenforceable contracts.

256. Plaintiffs and Class Members paid Liberty each month for Defendants' purported HCSM plans covering themselves and their families.

59

257. Liberty retained Plaintiffs' and Class Members' payments, and Plaintiffs and Class Members conferred a direct benefit on Defendants.

258. Defendants and their principals used the payments from Plaintiffs and Class Members for their own purposes and profits and to pay for the administrative and marketing costs of running the business, but not for the provision of actual services that were advertised (e.g., coverage for medical bills), as required by law.

259. Plaintiffs and Class Members made their payments as purported "voluntary" "contributions" for what they believed was an HCSM plan, but in reality, Defendants and its affiliated enterprises were not HCSMs, nor were the plans in question HCSM plans. They were illegal insurance contracts as defined by South Carolina law.

260. Rather than apply payments from Plaintiffs and Class Members to pay for participants' covered medical expenses, the covered medical claims of other Class Members, or improving the quality of health care, Defendants kept to themselves a substantial amount of the contributions by Plaintiffs and Class Members primarily as profit despite Liberty's organization as a non-profit charitable organization.

261. Defendants would be unjustly enriched if they were allowed to retain the money Plaintiffs and the Class Members have

paid to Defendants, and Defendants should not in equity and good conscience be permitted to keep the funds that Plaintiffs and Class Members paid to Defendants.

262. Defendants' inequitable conduct caused Plaintiffs and Class Members to pay to Defendants thousands of dollars or tens of thousands of dollars annually, payments to which Defendants were not legally permitted to receive or retain.

263. The failure to compensate Plaintiffs and Class Members for the extensive benefits conferred upon Defendants renders the transactions between Plaintiffs and the Class Members with Defendants unjust.

264. There being no enforceable contractual provision that expressly controls the subject matter of the instant claims, equity requires that Defendants pay restitution of the amounts paid by  Plaintiffs and Class Members unjustly retained by Defendants, plus interest, punitive damages, and the costs of litigation including attorneys' fees.

### FOR A FIFTH CAUSE OF ACTION

### (Conversion as to All Defendants)

265. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim.

266. Plaintiffs and Class Members paid thousands of dollars in monthly premiums to Liberty to obtain coverage for themselves and their families. Plaintiffs and Class Members paid

61

these monthly "contributions" to Defendants to participate in a purported HCSM plan offered by Defendants and to pay for medical expenses and the medical expenses of other Class Members and to pay for the reasonable administration costs of the plans.

267. Defendants had and do have a duty to maintain and preserve Plaintiffs' and Class Members' contributions for their proper and legally permitted purposes – covering Plaintiffs' and Class Members' medical expenses, and to prevent their diminishment through wrongful acts.

268. Liberty has, and without legal right, exercised dominion and control over Plaintiffs' and Class Members' "contributions" (i.e. premiums) paid by Plaintiffs and Class Members that were intended to cover Plaintiffs' and the Class Members' medical expenses and has wrongfully and without authority taken for itself, its principals, and certain third parties a significant portion of those contributions as administrative costs and profits, rather than using the contributions for the intended and rightful purpose, all in hostility to the rights of Plaintiffs and Class Members.

269. The funds that Plaintiffs and Class Members paid to Defendants constitute specific and identifiable funds earmarked for a specific purpose.

270. Defendants continue to wrongfully and unlawfully retain these funds without the authorization of Plaintiffs or Class

62

Members, and Defendants intend to permanently deprive Plaintiffs and Class Members of their contributions for Defendants' own profit rather than applying those payments to Plaintiffs' and Class Members' benefits claims or refunding the excess premiums received.

280. As a direct and proximate result of that wrongful conversion, Plaintiffs and the Class Members have suffered and continue to suffer damages.

281. Defendants have converted for their own use the periodic payments made by Plaintiffs and the Class in an amount to be determined at trial, including special, general, and punitive damages, interest, and the cost of litigation, including attorneys' fees.

**FOR A SIXTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty as to Defendant Liberty)**

282. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim.

283. The transactions and facts governing the relationship between Liberty on the one hand and Plaintiffs and Class Members on the other give rise to a fiduciary or confidential relationship between the parties, such that Liberty owed a heightened a duty of the utmost good faith to Plaintiffs and Class Members.

284. Plaintiffs and Class Members demonstrated enormous

63

trust in Liberty — a party of vastly superior power and bargaining position — by contributing millions of dollars every year for plan coverage in exchange for Liberty's promise to pay members' medical expenses promptly, to minimizing administrative costs, and making healthcare decisions in their best interest.

285. Liberty invited and accepted its power, responsibility, position of trust, and member contributions, and in turn, Plaintiffs and Class Members weakened their ability to make their own healthcare choices while reasonably assuming Liberty would place members' interests above the personal interests of Defendants and other third parties.

286. Liberty retained substantial discretion over the use of Plaintiffs' and Class Members' "contributions" and management of their healthcare by administering claim payments and appeals in a manner prohibited in insurance contracts.

287. In addition to this self-imposed discretion, Liberty purported to protect and facilitate the "faith-based," community structure of the plans offered, thereby elevating Liberty's relationship with Plaintiffs and Class Members above that of a traditional commercial relationship.

288. Liberty further elicited trust and reliance from Plaintiffs and Class Members by misrepresenting that it met the requirements of an HCSM, and that it had been continuously operating a sharing ministry since December 1999 (nearly twelve

years before Liberty was created).

289. As fiduciaries, Liberty was required to place members' interests above their own. As a result, Liberty was required to (i) exercise its position of trust with due care and good faith; (ii) provide members with all material information; (iii) act honestly in all respects; (iv) avoid conflicts of interest; and (v) avoid favoring the interests of anyone else over those of its members.

290. In violation of those duties, Liberty squandered, stole, and converted members' contributions in order to enrich its owners, de facto owner Daniel J. Beers, Beers's family, and other third parties — all without Plaintiffs' and Class Members' knowledge, consent, or authorization.

291. Liberty had a fiduciary obligation to use member contributions for payment of legitimate claims and reasonable administration costs. Instead, Liberty failed to protect and favor members' interests and allowed its owners and other third parties to line their pockets while members were left with millions of dollars in covered but unreimbursed medical expenses.

292. Liberty violated its duty of candor to members despite its superior knowledge and proprietary knowledge, skill, and position of trust, and despite knowing that it was in a position that requires the utmost good faith.

293. Liberty made materially false and misleading

65

representations and failed to provide material information that members and potential members would need to know to make an informed choice about joining or continuing to participate in Liberty's plans, including (without limitation) that: (i) Liberty was formed by, or at the direction, of Daniel J. Beers, who was found liable for fraud regarding similar activity; (ii) it was not authorized to sell HCSM plans; (iii) it was misleading consumers; and (iv) it was engaged in fraudulent advertising and misrepresentations.

294. Plaintiffs and the Class suffered damages as a proximate result of Liberty's fiduciary breaches.

295. Plaintiffs and Class Members each paid monthly hundreds or thousands of dollars and collectively incurred millions of dollars in covered but unreimbursed medical expenses based upon Liberty's breaches and its materially false and misleading information to members.

296. Liberty failed to provide members and potential members with material information they would need to know to determine whether to enter or remain in the plans. Liberty further failed to protect member contributions by misappropriating the funds. Indeed, rather than paying its members healthcare costs, Liberty ignored, declined, rejected, and otherwise failed to cover the claims submitted by its members, as it was required to do, leaving thousands of its members and former members crushed

by the burden of impossible medical debt or irrecoverably damaged credit.

297. By reason of the foregoing, Plaintiffs and the Class are entitled to recover from Liberty all damages and costs permitted by law, including actual, nominal, general, and punitive damages, their costs and reasonable attorneys' fees.

## FOR A SEVENTH CAUSE OF ACTION

## (Intentional, or Alternatively, Negligent Misrepresentation as to Defendant Liberty)

298. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim..

299. Liberty—in its promotional and membership materials, including on its websites, in membership identification cards (the equivalent of an insurance card), and in every Sharing Guideline published during the Class Period—made materially false and misleading representations and failed to disclose material statements that Liberty had a duty to disclose to Plaintiffs and Class Members, including those described below.

300. For example, Liberty falsely and misleadingly represented that:

  a. Liberty is a legitimate HCSM, when it was and is not

legitimate;

b. The plans offered by Liberty are not insurance, when the plans are actually illegal insurance contracts;

c. Monthly payments would go to covering members' medical expenses when, in fact, significant portions of payments were being converted by Liberty and the Affiliated Defendants for uses other than paying members' medical expenses; and

d. There was a permissible, legitimate, fair, and meaningful claim dispute resolution procedure when, in fact, the dispute resolution procedures were illegal and were designed and used by Liberty to facilitate Liberty's wrongful denial of covered claims.

301. Liberty had a duty to disclose the foregoing information based on its superior and proprietary knowledge and based on the special relationship, privity, and fiduciary duty Liberty shared with members, including Plaintiffs and the Class.

302. Liberty made the foregoing false and misleading representations and omissions recklessly or with actual knowledge of their falsity.

303. In the alternative, Liberty made the false and misleading representations negligently, as Liberty lacked any ground—much less a reasonable ground—to believe that Liberty's plans were legitimate HCSM plans. Moreover, the plans

offered by Liberty were insurance under federal law and state law. Liberty was not authorized as an insurer by federal or state law to sell or issue its insurance plans.

304. Liberty had a duty to not act negligently and to impart accurate information to Plaintiffs and other Class Members due to its relationship with Plaintiffs and Class Members and its superior knowledge of the facts and circumstances underlying the issuance of the plans and Liberty's interactions with courts, regulatory bodies, and attorneys general.

305. Liberty made the foregoing misrepresentations and failed to provide accurate and complete material information to induce Plaintiffs and Class Members to purchase the plans offered by Liberty and to continue paying periodic fees that Liberty then diverted to the Affiliated Defendants, their controlling individuals, and Liberty's de facto owner, Defendant Daniel J. Beers.

306. Plaintiffs and the Class justifiably and reasonably relied on the materially false and misleading representations contained in Liberty's promotional materials, membership materials, and websites, or otherwise acted without the aforementioned material information which Liberty had a duty to disclose.

307. Plaintiffs and Class Members purchased and maintained Liberty's plans and paid periodic premiums reasonably believing

that Liberty's plans were legal and legitimate HCSM plans, rather than shams designed to avoid federal and state insurance laws and permit Liberty to loot the plans; that the premiums would be used by Liberty to fund medical expenses; and that Liberty would pay medical expenses.

308. As a proximate result of Liberty's materially false and misleading misrepresentations and material omissions, Plaintiffs and the Class suffered damages, including many millions of dollars in contributions, as well as unreimbursed medical expenses.

309. Liberty has failed to pay providers all or a portion of numerous overdue medical bills chargeable to Plaintiffs and Class Members without just cause, often subjecting them to harassment, collection efforts, and potential enforcement actions.

310. By reason of the foregoing, Plaintiffs and the other Class Members are entitled to recover from Liberty all damages and costs permitted by law, including actual, nominal, general, and punitive damages, costs, and attorneys' fees.

## FOR A EIGHTH CAUSE OF ACTION

### (Accounting as to Defendant Liberty)

311. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim..

312. Plaintiffs and the other Class Members are entitled to

a full accounting and disclosure from Liberty of all administrative expenses and other payments to persons and entities from 2013 to the present.

313. Plaintiff and the Class Membership are further entitled to a full accounting of the "ShareBox" account or accounts, to whom those accounts paid money, and the structure by which they were held and dispersed by Liberty.

314. Plaintiffs and putative Class Members seek a Court Order requiring Liberty to produce said accountings according to law and for the public's benefit.

315. Plaintiffs and the other Class Members also seek disgorgement of any excessive and/or unnecessary expenses or other payments issued by Liberty to the detriment of Plaintiffs and the other Class Members, from either the Corporation's operating account or the "ShareBox" account or accounts it claims not to own, but controls.

## FOR A NINTH CAUSE OF ACTION

### Civil Conspiracy as to all Defendants

316. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim..

317. Each of the Defendants took part in a civil conspiracy to sell insurance products in the state of South Carolina that evaded the requirements of South Carolina Law.

318. This caused special damages to the Plaintiff and class

membership in that they were denied the host of statutory and regulatory benefits required by authorized insurance products.

319.  Each Defendant knew or should have known that insurance products are regulated by each state and were on notice that the insurance products that they aided in selling to Plaintiffs were insurance products and, as such, were subject to additional regulation.

320.  By selling unauthorized insurance products in the State of South Carolina, the Defendants were further able to avoid the oversight of the South Carolina Department of Insurance.

321.  Each Defendant further took part in a civil conspiracy to avoid registering as a charitable entity in the State of South Carolina.

322.  Each Defendant acted in such a manner with the intent to harm the Plaintiffs by denying them the regulatory and statutory protections these Plaintiffs and their elected officials have determined are necessary to ensure that the citizens of South Carolina are protected from unscrupulous self-dealers.

323.  These special damages are in addition to those already pled.

## FOR A TENTH CAUSE OF ACTION

## Violations of 18 U.S.C. § 1962(c) as to All Defendants

324. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim.

325. This claim for relief arises under 18 U.S.C. § 1964(a) of RICO and seeks relief from the Defendants (for their activities described herein constituting violations of 18 U.S.C. § 1962(c).

326. All of the conduct herein alleged was committed by the Defendants willfully, knowingly, maliciously and with reckless disregard of the rights of Plaintiffs and the Class.

327. At all material times, the Defendants controlled and/or conducted the enterprise described herein which engaged in substantial interstate and foreign commerce, and transacted business in the State of South Carolina(whether or not they are registered to do so). The transactions complained of herein negatively impacted interstate and foreign commerce by the use of the instrumentalities of such commerce for illegal purposes.

328. At all material times, in connection with the activities giving rise to this action, the Defendants willfully and knowingly conspired with each other, as well as others known and unknown to Plaintiffs and the Class, to engage in various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by 18 U.S.C. § 1962(c).

329. At all times relevant hereto, Plaintiffs, the Class,

and the Defendants were and are "persons" within the meaning of 18 U.S.C § 1961(3).

330. The Defendants together constituted a loose or informal association of distinct entities.

331. Each Defendant is sufficiently independent of the informal association-in-fact that orchestrated the scheme.

332. Each Defendant is sufficiently distinct from the associated-in-fact criminal enterprise such that each Defendant is liable as its own "person" pursuant to RICO laws. Despite mutual connection to the Beers family and some overlapping ownership, each entity is separate and distinct from one another. Liberty is incorporated in Virginia, CSS is incorporated in Ohio, Savnet is incorporated in Ohio, and MCS is incorporated in Ohio.

333. Each Corporate Defendant is also a separate ongoing business with a separate customer base. Each Defendant is free to act independently and advance its own interests contrary to those of the other corporations.

334. Each and every Defendant engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) by committing and/or conspiring to commit or aiding and abetting in the scheme by each one's participation in at least two such acts of racketeering activity, as described above, with all such acts having occurred since 2013, in furtherance of the scheme. In fact, the Defendants actually committed hundreds of predicate

74

acts.

335. Each one of these underlying predicate acts amounts to, or otherwise constitutes a threat of continuing racketeering activity, as racketeering is defined by federal RICO law.

336. The Defendants together perpetuated a criminal enterprise from at least 2013 until the present that has injured the Plaintiffs and many thousands of other Class Members.

337. Each of the acts of racketeering activity of the Defendants was related, had similar purposes, involved the same or similar participants and methods of commission, and had the same or substantially similar results and impact upon similarly situated victims.

338. The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by the Defendants all were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

339. The Defendants engaged in a pattern of racketeering activity through their operation and management of an association-in-fact enterprise with each other. In essence, these Defendants associated for the purpose of making money and other purposes from repeated criminal activity. The objectives and purposes of the enterprise included, but were not limited to,

enriching its members through the funds of Plaintiffs and the Class, funds which were stolen, unlawfully converted, or taken from Plaintiffs and the Class, and then distributed to the members of the enterprise after the funds crossed state boundaries. Each Defendant knew the funds had been stolen, unlawfully converted, or taken from Plaintiffs and the Class through fraud.

340. The Corporate Defendants, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers Jr., Douglas D. Behrens, Dorsey Morrow, Drudy Abel, Dale E. Bellis, Larry Foster, and Daniel J. Beers, transmitted and accepted funds through a pattern of interstate wire transfers while knowing the funds were obtained by fraud in order to encourage and/or effectuate the repeated and continued transmission and acceptance of further funds known to be obtained by fraud in furtherance of the conspiracy. These Corporate Defendants and Defendant Dan Beers managed, operated, and agreed to participate in a RICO enterprise and conspiracy. In furtherance thereof, the Corporate Defendants, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers Jr., Douglas D. Behrens, Dorsey Morrow, Drudy Abel, Dale E. Bellis, Larry Foster, and Daniel J. Beers engaged in a pattern of predicate acts during the relevant time period as alleged herein. This conduct and other circumstantial evidence demonstrate their agreement to deprive Plaintiffs and the Class of their funds

76

through fraud.

341. The Former Directors knowingly allowed the Corporate Defendants, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers Jr., Douglas D. Behrens, Dorsey Morrow, Drudy Abel, Dale E. Bellis, Larry Foster,  and Daniel J. Beers, to exercise control over Liberty and approved the transactions that caused funds to be transmitted by interstate wire transfers.  They further knew or should have known that those funds were obtained by Liberty through fraud in furtherance of the conspiracy.  Without the Former Directors' actions taking part in the affairs of the enterprise, the conspiracy could not have taken place.

342. The Defendants operated and constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The enterprise is an ongoing organization, which engages in, and whose activities affect, interstate commerce and transacts business in the State of Ohio (regardless of whether they are registered to do so). While the Defendants participated in the enterprise and were a part of the enterprise, these Defendants also had an existence separate and distinct from the enterprise.

343. The Corporate Defendants, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers Jr., Douglas D. Behrens, Dorsey Morrow, Drudy Abel, Dale E. Bellis, Larry Foster, Daniel J. Beers, and the former Director Defendants maintained an interest in and control of the enterprise and also conducted or

participated in the conduct of the enterprise's affairs through a pattern of racketeering activity. These Defendants' control of and participation in the enterprise was necessary for the successful operation of the scheme.

344. The enterprise described in this amended complaint was the means by which the Defendants carried out their illegal scheme and provided the necessary cover with which the Defendants and were able to conceal their scheme.

345. The enterprise had an ascertainable structure separate and apart from the pattern of racketeering activities in which the Corporate Defendants and Defendant Dan Beers engaged.

346. The Corporate Defendants, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers Jr., Douglas D. Behrens, Dorsey Morrow, Drudy Abel, Dale E. Bellis, Larry Foster, and Daniel J. Beers's close interpersonal relationships, their common interest in profiting from funds obtained by fraud, and the longevity of their affairs, together permitted them to participate in the affairs of an enterprise through their predicate acts throughout the relevant time period as alleged herein.

347. All of the Defendants, to include the current Director Defendants, engaged in one or more acts of mail fraud as a predicate act for the purposes of 18 U.S.C. § 1962(c); 18 U.S.C. § 1961(1); and 18 U.S.C. § 1341, by knowingly and willfully

devising the scheme to defraud the Class, or for obtaining money
or property by means of false pretenses, representations or
promises; and by using the United States Postal Service to mail,
or by causing to be mailed, promotional materials, account
statements, and other written materials containing
misrepresentations for the purpose of executing the scheme to
defraud Plaintiffs and the Class, on numerous occasions from 2013
through the present.

348. Specifically, the Defendants falsely and misleadingly
represented that Liberty was offering Plaintiffs and Class
Members memberships in an HCSM—including doing so in its
Application, Sharing Guidelines, websites, and in other marketing
and advertising materials—when, in reality, Liberty did not and
does not qualify as a HCSM under federal or state law, and was
and continues to be an unauthorized insurance product.

349. The Corporate Defendants, Thomas Fabris, Brandon
Fabris, Ronald Beers, Daniel Beers Jr., Douglas D. Behrens,
Dorsey Morrow, Drudy Abel, Dale E. Bellis, Larry Foster, Daniel
J. Beers, and the former Director Defendants also omitted from
Liberty's Application, Sharing Guidelines, websites, and in other
marketing and advertising materials that Liberty's arrangements
with related entities and affiliated enterprises were not arm's
length transactions as required by law. These concealed related
party transactions were part of a larger self-dealing scheme that

diverted member funds from Liberty and lined the pockets of its founders in a way totally contrary to its mission as a purported nonprofit HCSM and charitable organization.

350. In furtherance of the scheme to defraud, the Defendants continued and still continue to send misleading information to Plaintiffs to keep Plaintiffs from discovering the misrepresentations and to discourage Plaintiffs from pursuing their legal rights. These statements misled Plaintiffs and the Class into believing that they were investing in a valid HCSM plan and that the funds of Plaintiffs and the Class would be used to pay legitimate claims and necessary expenses. As a result of these fraudulent representations, the Defendants have gained the funds of Plaintiffs and the Class.

351. The Corporate Defendants, Thomas Fabris, Brandon Fabris, Ronald Beers, Daniel Beers Jr., Douglas D. Behrens, Dorsey Morrow, Drudy Abel, Dale E. Bellis, Larry Foster, and Daniel J. Beers also engaged in one or more acts of wire fraud as a predicate act for the purposes of 18 U.S.C. § 1962(c); 18 U.S.C. § 1961(1); and 18 U.S.C. § 1343, by knowingly and willfully devising and intending to devise a scheme and artifice to defraud others of money and property, by means of materially false and fraudulent pretenses, representations, and promises, as more fully described herein, by knowingly and willfully devising and intending to devise a scheme and artifice to defraud others,

of money and property, by means of materially false and
fraudulent pretenses, representations, and promises, as described
herein, and by perpetuating the fraud by means of interstate
transfers of monies. The Corporate Defendants, for the purpose of
executing and attempting to execute the scheme, did cause to be
transmitted in interstate commerce, by means of a wire
communication, certain signs, signals and sounds, that is,
transfers of monies from accounts in various states, in violation
of 18 U.S.C. § 1343.

352. Furthermore, and in violation of 18 U.S.C. § 2314, The
Corporate Defendants, Thomas Fabris, Brandon Fabris, Ronald
Beers, Daniel Beers Jr., Douglas D. Behrens, Dorsey Morrow, Drudy
Abel, Dale E. Bellis, Larry Foster, and Daniel J. Beers
repeatedly transmitted funds in excess of $5,000 across state
lines, knowing the same to have been stolen or obtained by his
fraud, on numerous occasions throughout the Relevant Time Period,
in order to pay those employed by and associated with the
enterprise. These funds were transferred, after being stolen and
having crossed a state boundary, through wire transfers in
furtherance of the objective of the enterprise of depriving
Plaintiffs and the Class of their funds.  The former Director
Defendants allowed and authorized many of these transfers while
they knew or should have known that the funds were obtained by
fraud.

353. The Current Director Defendants have continued the scheme despite the Ohio Attorney General settlement. The Directors continue to take part in the affairs of the enterprise and continue to commit the predicate acts of mail fraud discussed above. While the motivation for the continuation of the enterprise is unclear at this time, it is clear that the enterprise, though potentially much stunted by the Ohio Attorney General's settlement, continues.

354. The Defendants' RICO violations and scheme resulted in and continues to result in inflated "Sharing Amounts" and therefore lower payments to satisfy Liberty members' medical claims.

## FOR AN ELEVENTH CAUSE OF ACTION

### Declaratory Judgment

355. The paragraphs enumerated above are incorporated herein as if realleged and restated verbatim.

356. This cause of action is brought pursuant to the federal uniform declaratory judgement act, §28 U.S.C. 2201 et.seq; and the South Carolina Uniform Declaratory Judgement Act, S.C. code 15-53-10 et.seq;

357. Justiciable controversy exists by and among the parties in which the parties have a legal and actual interest and which is right for resolution.

358. The Plaintiff and the class seek a declaratory

82

judgement declaring that Liberty Health Share and the other
Defendants to this litigation are in fact participating in
illegal and unauthorized health insurance sales without
appropriate licenses and authority to do so.

## FOR A TWELFTH CAUSE OF ACTION

### Injunctive Relief

359.   The paragraphs enumerated above are incorporated
herein as if realleged and restated verbatim.

360.  Plaintiff is informed and believes that the class will
suffer harm and actually damage to the extent that the Defendants
are allowed to continue seeking perspective applicants and or
otherwise engaging in the acts and practices of which Plaintiff
complains in South Carolina.

361.  Plaintiff is therefore informed and believes that she
and the class are entitled to temporary and permanent injunctions
granting the relief sought herein above pursuant to FRCP Rule 65.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the following
relief against Defendants, jointly and severally:

1. That this Court certify the Class defined in Plaintiff's
amended complaint;

2. That this Court appoint Plaintiff as Representative of
the Class;

3. That this Court appoint Knie & Shealy Law Offices lead

counsel for the Class;

4. That this Court find and declare that Defendants are estopped from denying that the products that Liberty sold are contracts for insurance based on its response to the South Carolina Department of Consumer Affairs;

5. In the alternative, that this Court find and declare that Liberty's unauthorized health insurance plans were and are unauthorized contracts for health insurance under South Carolina Law and that Liberty and the other defendants were participating in the sale of those unauthorized health insurance contracts;

6. That this Court find and declare that each individual defendant, to include the Directors, is personally liable on each unauthorized insurance contract sold in South Carolina during his or her association with Defendant Liberty or the related entities as required by S.C. Code Ann. § 38-25-360;

7. That this Court issue an immediate preliminary and permanent injunction enjoining Liberty and its agents(and its officers, partners, agents, servants, representatives, salespeople, employees, successors or assigns, under the names they presently use or any other names, through any corporate or other device, and those in active concert and participation with the Defendants, directly or indirectly) from engaging in the acts and practices of which Plaintiffs complain in South Carolina;

8. That this Court impose a constructive trust over

84

Liberty's assets and business opportunities that were usurped by
Liberty and the Related Entities, to include the "sharebox"
accounts;

9. That this Court order the reformation of Liberty's and
the Related Entities' board and executive leadership to the
extent needed to prevent the illegal activities complained of by
Plaintiffs from continuing;

10. That this Court order that the Defendants are prohibited
from selling or transferring assets of Liberty, entering into
contracts on its behalf, acting as signatory on any financial
checking, savings or other financial accounts of Liberty, or
deciding issues of compensation to themselves, each other or any
member of their families, to include the "sharebox" accounts;

11. That this Court find and declare each Defendant jointly
and severally liable on all counts applicable to each Defendant
and Liberty's CEOs or directors personally liable upon finding
Liberty an unauthorized insurer pursuant to S.C. Code §38-25-360;

12. An award on behalf of Vicky Lynn and putative Class
Members against the Defendants, jointly and severally, of actual
damages, pre-judgment interest, punitive damages, restitution,
attorneys' fees and costs, and such other items as may be allowed
to the maximum extent permitted by law.

13. That this Court order the rescission of the unauthorized
health insurance plans and restitution of all premiums received

from members of the proposed class, including interest; or, at the option of the Class Member, reform each year's insurance contract to conform to the Affordable Care Act and South Carolina Law, S.C. Code Ann. § 38-71-10 *et seq.,* allowing the Class Member to resubmit claims for medical services, costs and other expense that would have been covered.

KNIE & SHEALY

*/s/ Patrick E. Knie*

Patrick E. Knie
pat@knieshealy.com
Federal I.D. No. 2370
Matthew W. Shealy
matt@knieshealy.com
Federal I.D. No. 12823
S.C. Bar No. 77724
P.O. Box 5159
250 Magnolia Street
Spartanburg, S.C.  29304
Telephone No. (864) 582-5118
Telefax No.   (864) 585-1615

ATTORNEYS FOR PLAINTIFF

May 17, 2024